338-10

**TO:** Julius Ciaccia
Executive Director

**DATE:** November 12, 2010

**FROM:** Marlene Sundheimer
Director of Law

**RE:** **Authorization to Amend Resolution No. 55-05 and Execute CSO LTCP Consent Decree**

# CSO Consent Decree Briefing Document

## Authorization Request

The District is seeking authorization to amend Resolution No. 55-05 adopted on March 3, 2005, to modify the schedule for implementation of the District's Combined Sewer Overflow (CSO) Long Term Control Plan (LTCP) and authorize the Executive Director to execute the proposed consent decree.

## Summary

Substantial agreement has been reached between the District's negotiating team and the state and federal governments on the substantive terms and conditions of the CSO consent decree. The District must execute the proposed consent decree to allow it to be forwarded to the appropriate officials with the Department of Justice (DOJ), the Ohio Attorney General's Office (OAG), and US and Ohio Environmental Protection Agencies (EPA) for review and approval. The Executive Director believes it is in the best interest of the District and its rate payers to adopt the negotiated $3.0 billion CSO LTCP with a 25-year schedule and to authorize him to execute the proposed consent decree to resolve alleged violations of the Clean Water Act and implement the proposed plan, **Project Clean Lake**. The United States, the State of Ohio, and the District recognize that this consent decree has been negotiated in good faith and will avoid prolonged and complicated litigation among the parties, and that this consent decree is fair, reasonable, and in the public interest.

The District initiated the consent decree negotiation process in January 2004 shortly after its originally proposed LTCP had been submitted to Ohio EPA pursuant to the terms of the

**Figure 1- Cost Comparison of Escalated Original CSO LTCP and Negotiated Agreement**




EXHIBIT C

6. Timely application and approval of all permits
7. Implement Nine Minimum Controls
8. Construction and implementation of CSO control measures within approved schedules
9. Post-construction Monitoring
10. Reporting requirements
11. Approval and implementation of chemically-enhanced high rate treatment pilot projects
12. Initial green infrastructure component of CSO control measures
13. Revisions of control measures to incorporate green for gray
14. Achievement of Performance Criteria
15. Payment of civil penalties and completion of Supplemental Environmental Projects

## Cost Escalation Impacts of Negotiations

The current negotiation team has been actively pursuing an agreement and resolution in order to avoid additional program escalation costs. As illustrated in Figure 2 below, the delays in arriving at a negotiated agreement have cost the District $588M in program escalation costs on the original $1.6B CSO LTCP and $53M in escalation costs on the Cost Refinements over the last seven years.

Figure 2 - Cost Comparison of Original CSO LTCP and Negotiated LTCP




While the 2010 negotiated agreement includes additional requests made by the Governments, it is significantly lower than the $3.7B proposal made by the Governments in 2009 as depicted in Figure 2. The concessions made during negotiations to achieve a slightly higher level of control in priority areas, along with wet-weather treatment at the plants, added $331M to the overall costs of the program, bringing the total negotiated program value to $3.0 billion in 2009$$.

**Impact on Rate Payers:** Figure 3 below illustrates that the annual rate increases from 2012 to 2016 are currently estimated to average 13% in order to support the Districts capital program and

operations and maintenance, including the negotiated $3.0 billion CSO LTCP program over the next 25 years. The average annual increase is currently projected at 5.7% thereafter for the next 20 years. The District has been able to reduce the average rate increase for 2012-2016 by restructuring its debt and refining its cash flow to actual bid amounts as opposed to planning estimates. A 2012-2016 rate study is anticipated to be completed in December 2010 and detailed discussions with the Board on future rate increases will take place following rate study completion.

*Figure 3 - Negotiated CSO LTCP Projected Impact on Rates (25-years)*




### What if the Board Rejects the Settlement and EPA Sues the District?

Should the Board elect this option, the Board should expect that the EPA and the Ohio EPA will commence litigation in the Federal courts. As with any litigation, the outcome will be uncertain. However, it is reasonable to anticipate that the EPA and Ohio EPA's starting point, or "floor," for any litigation effort would now be the worst-case offer, or "ceiling," that they placed on the table during negotiations and could include the following:

| | |
|---|---|
| Level of Control (system): | Easterly: 0 overflows for all SST & DVT controlled CSOs and ≤2 overflows @ remaining priority CSOs;<br>Southerly: ≤2 overflows @ priority CSOs;<br>Westerly: 0 overflows @ priority CSOs |
| Level of Control (Plants): | Easterly: 0 bypass events; |

EXHIBIT D

**NEORSD Proposed Rate Increases** Customers Affected 9133

Mean annual Income (2008) [1] $49,528.00
$4,127.33

**Based on Current Disposal Costs**

2011 Flat Sewer Rate/Benefit $62.22
2011 Maintenance Fee Assessment (Minimum) $5.08

| year | proposed rate increase [2] | disposal costs | incremental Increase | Cumulative Increase | Cumulative Monthly Increase to Customer Rate | Typ 2011 Monthly Flat Rate Bill (assume 3% annual increase) | Percent Increase from 2010 rate based on Usage of 6HCF per mo | Monthly sewer Bill | Percent of Mean Income |
|---|---|---|---|---|---|---|---|---|---|
| 2010 | | $7,500,000 | | | | | | | |
| 2011 | 1.090 | $8,175,000 | $675,000 | 9.00% | $6.16 | $67.30 | 9.15% | $73.46 | 1.78% |
| 2012 | 1.130 | $9,237,750 | $1,062,750 | 23.17% | $15.86 | $69.32 | 22.87% | $85.18 | 2.06% |
| 2013 | 1.130 | $10,438,658 | $1,200,908 | 39.18% | $26.81 | $71.40 | 37.55% | $98.22 | 2.38% |
| 2014 | 1.130 | $11,795,683 | $1,357,025 | 57.28% | $39.20 | $73.54 | 53.30% | $112.74 | 2.73% |
| 2015 | 1.130 | $13,329,122 | $1,533,439 | 77.72% | $53.19 | $75.75 | 70.21% | $128.94 | 3.12% |
| 2016 | 1.130 | $15,061,908 | $1,732,786 | 100.83% | $69.00 | $78.02 | 88.43% | $147.02 | 3.56% |
| 2017 | 1.100 | $16,568,098 | $1,506,191 | 120.91% | $82.74 | $80.36 | 102.96% | $163.10 | 3.95% |
| 2018 | 1.100 | $18,224,908 | $1,656,810 | 143.00% | $97.86 | $82.77 | 118.22% | $180.63 | 4.38% |
| 2019 | 1.080 | $19,682,901 | $1,457,993 | 162.44% | $111.16 | $85.26 | 130.38% | $196.42 | 4.76% |
| 2020 | 1.080 | $21,257,533 | $1,574,632 | 183.43% | $125.53 | $87.82 | 142.95% | $213.35 | 5.17% |
| 2021 | 1.080 | $22,958,136 | $1,700,603 | 206.11% | $141.05 | $90.45 | 155.94% | $231.50 | 5.61% |
| 2022 | 1.080 | $24,794,786 | $1,836,651 | 230.60% | $157.80 | $93.16 | 169.38% | $250.97 | 6.08% |
| 2023 | 1.037 | $25,712,193 | $917,407 | 242.83% | $166.18 | $95.96 | 173.17% | $262.13 | 6.35% |
| 2024 | 1.037 | $26,663,545 | $951,351 | 255.51% | $174.86 | $98.84 | 176.91% | $273.69 | 6.63% |
| 2025 | 1.037 | $27,650,096 | $986,551 | 268.67% | $183.86 | $101.80 | 180.60% | $285.66 | 6.92% |
| 2026 | 1.037 | $28,673,149 | $1,023,054 | 282.31% | $193.19 | $104.86 | 184.25% | $298.05 | 7.22% |
| 2027 | 1.037 | $29,734,056 | $1,060,907 | 296.45% | $202.87 | $108.00 | 187.84% | $310.87 | 7.53% |
| 2028 | 1.037 | $30,834,216 | $1,100,160 | 311.12% | $212.91 | $111.24 | 191.39% | $324.15 | 7.85% |
| 2029 | 1.037 | $31,975,082 | $1,140,866 | 326.33% | $223.32 | $114.58 | 194.90% | $337.90 | 8.19% |
| 2030 | 1.037 | $33,158,160 | $1,183,078 | 342.11% | $234.12 | $118.02 | 198.38% | $352.13 | 8.53% |
| 2031 | 1.037 | $34,385,012 | $1,226,852 | 358.47% | $245.31 | $121.56 | 201.81% | $366.87 | 8.89% |
| 2032 | 1.037 | $35,657,257 | $1,272,245 | 375.43% | $256.92 | $125.20 | 205.20% | $382.12 | 9.26% |
| 2033 | 1.037 | $36,976,576 | $1,319,319 | 393.02% | $268.96 | $128.96 | 208.56% | $397.92 | 9.64% |
| 2034 | 1.037 | $38,344,709 | $1,368,133 | 411.26% | $281.44 | $132.83 | 211.88% | $414.27 | 10.04% |
| 2035 | 1.037 | $39,763,463 | $1,418,754 | 430.18% | $294.39 | $136.81 | 215.17% | $431.20 | 10.45% |
| 2036 | 1.037 | $41,234,712 | $1,471,248 | 449.80% | $307.81 | $140.92 | 218.43% | $448.73 | 10.87% |
| | total | **$659,786,708** | **$33,734,712** | | | | | | |

[1] Mean Income from US Census Bureau http://quickfacts.census.gov/qfd/states/39/39153.html

[2] Proposed rate increase from CSO Consent Decree briefing document figure 3 "Negotiated CSO LTCP Projected Impact on Rates (25 years)" on Page 8

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
WASHINGTON, D.C. 20460

OFFICE OF
WATER

February 17, 2000

CWSRF 00-08

**MEMORANDUM**

SUBJECT: User Charge System Requirements for Treatment Works Constructed under Title II of the Clean Water Act and the Clean Water State Revolving Fund Program

FROM: Michael B. Cook, Director
Office of Wastewater Management

TO: Water Division Directors
Regions I-X

This is in response to recurring questions from various parties concerning the length of time user charge system requirements apply to wastewater treatment works constructed with grant funds awarded under Title II of the Clean Water Act and treatment works constructed with funds made available through the Clean Water State Revolving Fund Program. A discussion of the user charge system requirements under each of the programs is set forth below:

**User Charge Requirements for Treatment Works Constructed With Grant Funds Awarded Under Title II of the Clean Water Act**

Section 204(b)(1)(A) of the Clean Water Act, 33 U.S.C. 1284(b)(1)(A), requires, as a condition of receiving Federal funding for wastewater treatment works, that the applicant:

> . . .has adopted or will adopt a system of charges to assure that each recipient of waste treatment services within the applicant's jurisdiction... will pay its proportionate share...of the costs of operation and maintenance (including replacement) of any waste treatment services provided by the applicant;

Regulations implementing Section 204(b)(1)(A) require that grantees as a condition of Title II funding adopt, implement, and maintain a user charge system. The regulations set forth the requirements for such user charge system(s). Under 40 CFR 35.925-11 (1974) "the applicant must agree that such system(s) will be maintained"...and under 40 CFR Part 35, Subpart E, Appendix B at (f)(1974) "The user charge system...shall be maintained by the grantee in accordance with the following requirements:"

EXHIBIT
E

We have been asked by states, grantees, and rate payers whether the Title II user charge system requirements continue to apply even though the Title II construction grant was awarded many years ago. The answer is yes. The Clean Water Act does not place a time limit on how long the user charge system requirements must be maintained. Early Title II construction grant regulations indicated that user charge system requirements were to be maintained for the service life of the treatment works [40 CFR 35, Subpart E, Appendix B at (d) (1)]. Service life has been interpreted by the Agency as the useful life of the treatment works. Subsequent Title II construction grant regulations stated specifically that user charge system requirements must be implemented for the "useful life of the treatment works" [ 40 CFR 35.2208 (1984)]. "Useful life" is defined as the "period during which a treatment work operates" [40 CFR 35.2005(b)(51) (1984)]. Therefore, so long as the grant-funded treatment works have not been abandoned, or the Federal interests disposed, the Title II construction grant requirements for the user charge system remain as long as the treatment works are operational.

In order for user charge systems to meet the Title II construction grant requirements, each user (or user class) must pay its proportionate share of operation and maintenance (including equipment replacement) costs of the waste treatment services based on the quantity and character of its discharges [40 CFR 35.929-1(a)]. While the statute and regulations permit the establishment of classes of users, the classes that are established must be based on the "users having similar flows and wastewater characteristics; *i.e.*, levels of biochemical oxygen demand, suspended solids, etc." [40 CFR Part 35, Subpart E, Appendix B, at (e)]. Generally, most wastewater treatment grantees establish four user classes having similar wastewater flow and characteristics: residential, commercial, industrial, and governmental/institutional. When such user classes are established, each class is assigned its share of the waste treatment works operation and maintenance (including equipment replacement) costs based on the proportional contribution of the class to the total treatment works loading. Each user within a user class pays its proportionate share of the costs attributed to the user class. When the costs of wastewater treatment increases or decreases, the grantee must proportionately increase or decrease the wastewater treatment rates for each class of users. The one exception to the proportionality requirement is for low income residential users provided in Section 204(b)(1).

**User Charge Requirements for Treatment Works Constructed With Funds Made Available Through the Clean Water State Revolving Fund (CWSRF) Program**

Section 602(b)(6) of the Clean Water Act, 33 U.S.C. 1382(b), requires that treatment works constructed in whole or part before October 1, 1994, with funds made directly available by capitalization grants (known as "CWSRF equivalency funds") from the state water pollution control revolving fund must also comply with the user charge system requirements set forth in Section 204(b)(1)(A) of the Clean Water Act. However, the CWSRF statute and regulations (40 CFR Part 35, Subpart 31) require only that states meet the statutory requirements, not the federal regulatory requirements promulgated for the Title II construction grants program. The CWSRF regulations at 40 CFR 35.3135 allow states to develop their own procedures for implementing the statutory provisions. The statutory requirements for the CWSRF program do not specify a time frame for the imposition of the user charge system. Therefore, states can use the federal regulatory definition for the "useful life" of the facilities, the duration of the loan, or any other criteria to

establish the applicable time period for the user charge system requirements under their CWSRF programs. Each state's CWSRF agency is responsible for establishing its specific user charge system implementation procedures which will be accepted by the Regional Administrator if the procedures adequately assure compliance with the statutory requirements.

In the situations where treatment works received funding from both Title II construction grants and CWSRF loans, the recipients as a minimum must adhere to the user charge system requirements of the Title II construction grants program.

**Compliance Under Title II and CWSRF**

The normal course of action for non-compliance with user charge requirements is for EPA and the state to provide the grantee/loan recipient with technical assistance plus an opportunity to correct its user charge system in order to avoid grant annulment or compliance action.

In the case of Title II grant recipients, the failure to meet the user charge requirements discussed above can ultimately result in the annulment of their construction grant(s) and repayment of all construction grant funds [40 CFR 30.920-5 (1979)]. With regard to CWSRF loan recipients, a state would be expected to bring a compliance action against the loan recipient pursuant to Section 605 of the Clean Water Act and 40 CFR 35.3170 for failure to satisfy the terms of its loan agreement and the state capitalization agreement with regard to user charges system as required by Section 602(b)(6) of the Clean Water Act.

If you have any questions on how user charge requirements apply to these programs, please call me at (202)260-5850 or Haig Farmer at (202)260-7279.

cc: Regional Branch Chiefs
CWSRF Coordinators

**From:** Fleetwood, Tonia (ENRD)
**To:** Ellis, Steven (ENRD)
**Cc:** Furrie, Kristin (ENRD); Papagiika, Kathryn (ENRD); Davis, Joe (ENRD)
**Subject:** FW: Comment on United States v. Northeast Ohio Regional Sewer District, D.J. Ref. 90-5-1-1-08177/1
**Date:** Friday, January 28, 2011 7:55:19 AM

Please see public comment received below for NEORSD.

-----Original Message-----
From: Michelle Vanderaar
Sent: Thursday, January 27, 2011 11:56 PM
To: ENRD, PUBCOMMENT-EES (ENRD)
Subject: Comment on United States v. Northeast Ohio Regional Sewer District, D.J. Ref. 90-5-1-1-08177/1

The Honorable Ignacia S. Moreno
Assistant Attorney General, Environment and Natural Resources Division
P.O. Box 7611
U.S. Department of Justice
Washington, DC 20044-7611

United States v. Northeast Ohio Regional Sewer District, D.J. Ref. 90-5-1-1-08177/1

Dear Ms. Moreno:

I am writing to protest the egregiously excessive expenses imposed by the EPA's consent agreement on the region of Northeast Ohio under the jurisdiction of the Northeast Ohio Regional Sewer District (NEORSD). This court-created entity "NEORSD" has been commandeered by political forces with a history of incompetence and corruption. The political climate favors using EPA mandates as an opportunity to generate a source of revenue for local officials, while allowing these same elected and unelected officials, to innocently and pretentiously claim no responsibility. Instead of truly making cost-effective efforts to meet the spirit of the Clean Water Act, this NEORSD, a politically-motivated entity, is seizing upon the opportunity to use the pretext of reducing water pollution, to impose an autocratic tax on citizens of the region. This new water tax will drive out businesses, deter new businesses from locating to the area, increase foreclosure rates, cause renters to seek residences outside of the service area, and generally accelerate the economic decline of the greater Cleveland area, to the point from which it will take the better part of a century, if not longer, to recover.

How Clean is Clean Enough?

Consider how far the region has come, in cleaning up polluted water. Our pollutant discharge levels are a mere fraction of those measured during the 1969 Cuyahoga River fire. Aquatic and insect life is now observed along the entire length of the Cuyahoga River, except for the region upstream of the State Route 82 dam (Ref. 1). Lake Erie bacterial levels are routinely far worse in Rondeau Bay, on the relatively lightly-inhabited north shore, than in the area around Cleveland, where sewer and stormwater effluent eventually flows.

Absurd to Classify 100% of Precipitation Runoff as Pollution

As a resident of Northeast Ohio, with its generous annual

precipitation, I object to rainwater runoff being classified as pollution by the EPA. Application of combined sewer overflow (CSO) rules require more emphasis on the quantity of runoff, instead of its quality. It is absurd for an unelected bureaucracy, to impose fines and penalties on me, because rain falls on my property. I would gladly hoard and consume my own "polluted" rainwater, in exchange for preventing the EPA and NEORSD from taxing me into foreclosure!

Billing Based on Incorrect Measure of Consumption, Instead of Effluent into Sewers

Unfortunately, I will not be charged on the amount of water that flows into the sewers that service my property. Instead, I am charged on the amount of water that I consume, as determined by the Cleveland Division of Water. This incredibly incompetent government utility, is unable to read water meters annually. In fact, I own property serviced by the Cleveland Division of Water, for which meters are not read at the time of title transfer, and for which I am forced to lift the manhole covers and check the water meter readings in the street vaults, myself, since the meters have not been read for periods as long as 5-6 years. In addition, they produce so-called "actual" meter readings, which would require impossibly high amounts of water consumption. The incompetence of the Cleveland Water Department in attempting to correctly bill their customers, is extremely well-documented (Refs. 2-8). Now consider that these extreme billing problems originated under the leadership of the Cleveland Division of Water commissioner Julius Ciaccia, who was promoted to executive director of NEORSD, possibly as a reward for his stunning performance in generating a remarkable 1,000-fold increase in customer complaints. Until the basis for billing is brought under control, it is unfathomable to impose this nightmare of huge rate increases on NEORSD customers.

Devastating Impact of Rate Increases on Local Community Underestimated

In order to calculate the impact of Project Clean Lake on the region, an economic impact assessment was conducted by Cleveland State University. This study (Ref. 9) appears to be an utter misapplication of IMPLAN software. It completely omits factors that could reduce the anticipated revenue of the proposed rate increases, such as the declining population of the area, efforts by consumers to conserve due to increased cost of water, increased foreclosure rates precipitated by large increases in water and sewer rates, relocation of residents and businesses to other areas less burdened by high utility costs, businesses that avoid the NEORSD region due to the huge projected water/sewer rates forecast, and homebuyers that select homes just outside of the NEORSD, to avoid rate increases.

The CSU report asserts, that every dollar of capital expenditure, over the 7-county region, from 2012-2016, will result in $2.63 of economic impact. However, there is no mention of the fact, that every dollar spent, came out of a resident's savings, or a business' potential payroll, which would have been spent in some other way that would have also generated additional economic impact in the region!

If we can simply tax ourselves into prosperity, then why stop at $3.6B of economic impact? Why stop at 2% of our gross income? Let's increase the water and sewer fees to 50% of our incomes, and we will all be swimming in economic impact! Jobs will be created! Tax revenues will be generated! All because customers are being forced to pay higher rates? This is absolutely absurd, yet this is the logical, unstated

basis of the entire economic impact assessment.

Non-Equivalence of Utilities

Julius Ciaccia, executive director of NEOSRD, has lamented that utility consumers should expect to pay just as much for their water and sewer service, as they pay for natural gas and electricity. Ignoring for a moment that Cleveland is located on the largest group of fresh water lakes in the world, the Great Lakes, which contain over 20% of all of the entire planet's fresh surface water, which would logically make the cost of this magnificent resource less expensive to consumers, than the costs of natural gas or electricity, which require mining, transport, and other substantial production costs. The executive director also ignores the chaos that would arise from excessive water charges, due to the uniquely pilferable nature of water, as compared with natural gas, or electricity.

Other Wastewater Storage Options Ignored

Project Clean Lake only considers new construction of tunnels for wastewater storage, but apparently ignores potentially existing venues. One example is the Eastlake coal slurry pipeline, which carried coal slurry from Cadiz, Ohio, to a Cleveland Electric Illuminating Company power plant, from 1957 to 1963, a distance of 108 miles. If an uninformed resident like myself has knowledge of this coal slurry pipeline, I imagine that the county engineers, with all of their records, should be able to locate numerous, abandoned pipelines, that might be suitable for use as temporary wastewater storage, during periods of stormwater overflow.

In conclusion, this so-called "Project Clean Lake" is a wasteful, unnecessary, and destructive project, that will be used by politicians to exploit residents of the greater Cleveland area. It will be used to transfer money from the residents of the NEORSD district, that have already installed separate sanitary and storm sewers, and therefore do not contribute to the CSO problem, to subsidize problems originating in the oldest developed areas, which still rely on combined sanitary and storm sewers. This consent agreement will destroy the economic viability and competitiveness of the NEOSRD region, a fact that was completely ignored by CSU's so-called Economic Impact Assessment, and I urge the EPA and NEORSD to consider alternative solutions.

Sincerely,
<signed>
Michelle Vanderaar

1. http://www.ohio.com/news/44643012.html
2. http://www.adjustmywaterbill.com/
3. http://blog.cleveland.com/metro/2009/02/cleveland_division_of_water_ex.html
4. http://blog.cleveland.com/metro/2009/06/cleveland_division_of_water_dr.html
5. http://www.complaintnow.com/:-Who%27s-running-the-water-dept?/complaint/complaints/message/show/0/0/148743/0
6. http://www.complaintnow.com/City-of-Cleveland-Division-of-Water/complaint/complaints/thread/print/0/154531
7.

http://www.cleveland.com/business/index.ssf/2010/07/a_flood_of_complaints_about_cl.html
8.
http://www.cleveland.com/opinion/index.ssf/2011/01/clevelands_water_is_great_but.html
9. Austrian, Z., Clouse, C., and I. Lendel, "Northeast Ohio Regional Sewer District: Economic Impact of Operating and Capital Expenditures, 2012-2016." Cleveland State University Maxine Goodman Levin College of Urban Affairs, Center for Economic Development. Cleveland, OH: Sept. 2010.

**From:** Fleetwood, Tonia (ENRD)
**To:** Ellis, Steven (ENRD)
**Cc:** Furrie, Kristin (ENRD); Papagiika, Kathryn (ENRD); Davis, Joe (ENRD)
**Subject:** FW: UnitedStates v.Northeast Ohio Regional Sewer District, D.J. Ref. 90-5-1-1-08177/1
**Date:** Friday, January 28, 2011 2:04:11 PM

---

Please see public comment received below re: NEORSD.

**From:** Stuart Reader
**Sent:** Friday, January 28, 2011 12:44 PM
**To:** Fleetwood, Tonia (ENRD)
**Subject:** Fwd: UnitedStates v.Northeast Ohio Regional Sewer District, D.J. Ref. 90-5-1-1-08177/1

---------- Forwarded message ----------
From: **Stuart Reader**
Date: Fri, Jan 28, 2011 at 12:42 PM
Subject: UnitedStates v.Northeast Ohio Regional Sewer District, D.J. Ref. 90-5-1-1-08177/1
To: pubcomment-ees.enrd@usdoj.gov

This action taken by the Federal government is most ill-advised and will create hardships for a great number of citizens on fixed income, those whose who work from paych to paycheck and a region (Northeast Ohio) that has suffered economically over the last two decades.

What are the people living off social security, or other fixed incomes to do. It is agreed by proponents and opponents of this case that the cost of water and sewerage will go up three times the present cost within 6 years of enactment, doubling within three or 4 years. An average bill of $100 dollars becomes $300!!!! Again this is consensus. What choices do these people have? Is it food, water, rent, medicine, heating, electric what is it that I don't pay????????????? Please enlighten, what choice, what should we do without, surely there must be an answer. I humbly submit for your vision and answer to those who are in jeopardy.

This region is attempting to reinvent itself, after losing amost significant portion of it's economic base, manufacturing. These increased costs do not make it easier for the developement people to make a case for our region.

The factual basis for this action are more ethereal than real. The cost; 3 months ago it was 3.5 billion, two months ago it became 3billion.
Truly we have seers and people of uncommon wisdom and knowledge to put together numbers without fesibility studies, let alone actual engineering plans.

The basis for all of the above is without merit for a rational process. The number 4.5 billon gallons of untreated effluent is another ethereal factoid. What is the basis. Under what conditions ie; how much rainfall, over what period of time, in which areas, where is the testing after said occurences, what is the basis for this number?????????????

This area has not gained population. In fact the oldest areas with the most suspect infrastructure has lost population. The city of Cleveland in 1950 was over 900,000 thousand,

the 2010 census put us hovering around 400,000. The service area of the Sewer District has lost population since 1990. We have more green space due to the removal (tearing down) of all manner of structures. Be it residential, commercial, industrial, governmental, non-profit, church, and tree forts. They have not been replaced. Look at new construction, if you can find it, some , but nowhere near replacement.

This type of action is a travesty perpetrated by people who have no accountibility and a catrastophy for many of those effected.

Respectfully, Stuart Reader

NRDC
THE EARTH'S BEST DEFENSE

NATURAL RESOURCES DEFENSE COUNCIL

January 28, 2011

Assistant Attorney General
Environment and Natural Resources Division
P.O. Box 7611
U.S. Department of Justice
Washington, DC 20044-7611
Via U.S. Mail and Email (pubcomment-ees.enrd@usdoj.gov)

Re:
United States v. Northeast Ohio Regional Sewer District, D.J. Ref. 90-5-1-1-08177/1

Dear Assistant Attorney General:

On behalf of the Natural Resources Defense Council (NRDC) and its more than 1.3 million members and online activists (including over 16,900 in Ohio), we submit the following comments on the proposed consent decree in the above-referenced case.

We applaud the investment in green infrastructure solutions to stormwater problems. This investment will directly benefit the more than one million people in the Northeast Ohio Regional Sewer District's (NEORSD's) service area through reduced stormwater overflows and improved water quality, but also through a range of co-benefits that have been documented to result from green infrastructure, including: reduced energy consumption and cost, increased open space and reduced temperatures caused by the urban heat island effect.[1] Municipalities are increasingly able to quantitatively measure these benefits. For example, Philadelphia estimates that, over a 40-year period, it would receive more than $2.8 billion dollars in additional benefits, including energy savings, property value increases, avoided social service costs and reduced mortality related to heat stress, from a proposed $1 billion public investment in green infrastructure and the implementation of an on-site stormwater retention rule for private development and redevelopment projects.[2] Similarly, the City of New York estimates that, over a 20-year period, it would receive between $139 and $418 million in additional benefits, including energy savings and property value increases, from proposed city-wide green infrastructure investments.[3]

---

[1] Center for Neighborhood Technology and American Rivers, "The Value of Green Infrastructure" (2010)(avail. at http://www.cnt.org/repository/gi-values-guide.pdf); U.S. Environmental Protection Agency, "Green Infrastructure Case Studies: Municipal Policies for Managing Stormwater with Green Infrastructure" (August, 2010)(avail. at http: www.epa.gov).

[2] Stratus Consulting, "A Triple Bottom Line Assessment of Traditional and Green Infrastructure Options for Controlling CSO Events in Philadelphia's Watersheds: Final Report," August 24, 2009, p. S3.

[3] City of New York, "NYC Green Infrastructure Plan: A Sustainable Strategy for Clean Waterways" (September, 2010) (avail. at http://www.nyc.gov/html/dep/pdf/green_infrastructure/NYCGreenInfrastructurePlan_LowRes.pdf).

www.nrdc.org
2 N. Riverside Plaza, Suite 2250
Chicago, IL 60606
TEL 312 663-9900
FAX 312 651-7919

NRDC is a signatory to the U.S. Environmental Protection Agency's (EPA's) "Green Infrastructure Statement of Intent" (April 19, 2007),[4] in which EPA and four national groups agreed to promote the use of green infrastructure to reduce stormwater runoff and combined sewer overflows. In the Statement of Intent and other policy statements that followed it, EPA has affirmed its intent to promote green infrastructure as a component of Long Term Control Plans (LTCPs), including through enforcement actions such as consent decrees.[5] We are pleased that this consent decree builds on the adaptive management and green infrastructure requirements of other recent actions, such as the agreement reached in Kansas City, Missouri in 2010. We are especially pleased that the "green" and "gray" solutions seem to be held to the same standard of compliance. EPA, the U.S. Department of Justice (DOJ) and NEORSD have laid out a very clear path for how each type of solution must meet the required performance standard.

We submit the following four comments to the consent decree in Northeast Ohio:

1. In paragraph A, Part 6 of Appendix 3, the consent order requires that "each Phase I site-specific Green Infrastructure control measure shall be monitored for a minimum of 12-months immediately following implementation." We urge DOJ and EPA to require monitoring for a minimum of **24** months following implementation, with ongoing monitoring provided as part of the "postconstruction monitoring." As EPA recognizes, an effective green infrastructure approach to Combined Sewer Overflow (CSO) abatement is inherently an "adaptive management" approach. Therefore, to ensure success, it is critical to ensure sufficient monitoring of progress so that mid-course corrections can be made -- e.g., improving upon designs for green infrastructure installations if initial designs turn out not to perform as well as anticipated, or broadening the use of a particular design if it turns out to perform better than anticipated.
2. We urge NEORSD to consider entering into management agreements with nonprofit organizations and local land trusts who already own parcels that could be managed to provide green infrastructure benefits, rather than just purchasing property. This could save NEORSD land acquisition funds as it strengthens nonprofit and land trust partners. Other cities are undertaking similar efforts. For example, in Philadelphia, Fairmount Park manages two of its holdings to retain stormwater as part of an agreement with the Philadelphia Water Department.
3. We applaud the strong public participation component of the order, especially the Environmental Justice (EJ) Considerations. We urge NEORSD to expand on its educational programs featured on its website, "Rain working for you: Stormwater management tools you can use at home," and to include cost-share programs for home owners.
4. We also urge NEORSD to create a page on its website to report, in real-time if possible, on the progress of the implementation of the Plan. The monitoring and evaluation that NEORSD will undertake will be of interest to municipalities, states, civic organizations and others across the country. NEORSD's activities will significantly increase understanding of the performance of green infrastructure control measures; making that information easily accessible will be very valuable.

---

[4] U.S. Environmental Protection Agency et. al., "Green Infrastructure Statement of Intent" (April 19, 2007) (avail. at http://www.epa.gov/npdes/pubs/gi_intentstatement.pdf).

[5] See, e.g., EPA Memorandum, "Use of Green Infrastructure in NPDES Permits and Enforcement" (August 16, 2007) (avail. at http://www.epa.gov/npdes/pubs/gi_memo_enforce.pdf); USEPA, "Managing Wet Weather With Green Infrastructure: Action Strategy" (January, 2008)(avail. at http://www.epa.gov/npdes/pubs/gi_action_strategy.pdf).

Finally, we strongly urge EPA to issue nationwide guidance on incorporating green infrastructure into CSO consent orders and Long-Term Control Plans (LTCPs), as the agency has pledged to do in the above-referenced EPA policy statements.

Thank you for your consideration of these comments.

Sincerely,

Karen Hobbs
Senior Policy Advocate, Water Program

**From:** Heatherall, Tosa (ENRD)
**To:** EEs, Steven (ENRD)
**Cc:** Frame, Kristin (ENRD); Pasaerda, Kathryn (ENRD); Davis, Joe (ENRD)
**Subject:** FW: United States v. Northeast Ohio Regional Sewer District, Civil Action No. 10-cv-02895 Sierra Club NEO Group Comments
**Date:** Friday, January 28, 2011 3:52:33 PM
**Attachments:** NEO Sierra Comments NEORSD Consent Decree.doc

---

Public Comment re: NEORSD.

**From:** Bob Greenbaum
**Sent:** Friday, January 28, 2011 3:43 PM
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Cc:** Patricia McKenna; Steve McPhee
**Subject:** Re: United States v. Northeast Ohio Regional Sewer District, Civil Action No. 10-cv-02895 Sierra Club NEO Group Comments

# Sierra Club
## Northeast Ohio Group

NEO Sierra Club
PO Box 476
Avon, Ohio 44011
http://ohio.sierraclub.org/northeast/

Contact
Bob Greenbaum
4105 Stilmore Rd.
Cleveland, Ohio 44121
(216)382-4321
bombhumbug@att.net

Steve McPhee
19 Parkview Dr.
Berea, Ohio 44134
(440)891-0714

fixitsteve@gmail.com

Jan 28, 2011

Ms. Ignacia S. Moreno, Assistant Attorney General Environment and Natural Resources Division
P.O. Box 7611, U.S. Department of Justice
Washington, DC, 20044–7611
Re: United States v. Northeast Ohio Regional Sewer District, Civil Action No. 10–cv–02895
D.J. Ref. 90–5–1–1–08177/1 VIA E-MAIL: mailto:pubcomment-ees.enrd@usdoj.gov

Dear Ms. Moreno,

The Sierra Club Northeastern Ohio Group is submitting this comment in regard to the Northeast Ohio Regional Sewer District (the "District") Consent Decree (the Decree). (Civil Action No. 10–cv–02895) D.J. Ref. 90–5–1–1–08177/1

I. Public Document Repository

The Decree does not allow for sufficient public access to submissions made by the District to US-EPA/O-EPA and their responses to the District. This is neither fair nor reasonable (in the public interest). Public participation during the process of achieving the Decree's Objectives should not end with the closing of the Federal Register comment period. Since the Decree relies entirely upon submissions by the District to track compliance, it is crucial that the public have access to these submissions to ensure that the District is maintaining compliance with the Decree's objectives. (See CFR 40, Part 25, 25.3 Policy and objectives.)

The Decree should require that all documents related to the Decree such as NEOSRD's Long Term Control Plan and all documents which are submitted by the District to US-EPA/O-EPA be placed into a Public Document Repository (PDR). This includes documents that are pending approval, conditionally approved, approved in part or disapproved entirely. All responses by US-EPA/O-EPA to the District's submissions should also be placed into the repository. Further, all Decree related documents;
District submissions; and regulatory agency responses should be made available, in a conspicuous manner, to the public through the District's website within 24 hours of submission/response. These documents should be maintained in an orderly and/or chronological manner. There should be no fee to access the documents from the District's website. Any notices for public meetings, hearings, meetings in open Court, opportunities for comment, etc., should be submitted to the repository and posted in a conspicuous location on the website.

A definition should be added in "Section IV" to create the PDR. The repository shall be a specific location where the District makes documents available for public review and it shall also include the District's website (currently < http://www.neorsd.org/ >). Documents sent to the PDR pursuant to this Decree are intended to be available for public review and copying/printing. The District bears sole responsibility for depositing the documents and posting them on the website.

It is in the public interest that there be open, transparent, and timely access to the proceedings of the Decree during its implementation so that monitoring and oversight of public funds and obligations can be reviewed. The Department of Justice should withdraw or withhold entry of the Decree until the above mentioned public participation provisions and PDR are added to the decree.

By entering the Decree, the Court assures the parties and the public that there is no just reason for delay and assures that the Decree is legal and adequate (can be relied upon). ("In placing the judicial imprimatur on the decree, the court provides the parties [and the public] with some assurance that the decree is legal and that they may rely on it.") (Martin v. Wilks, 490 U.S. 755, 788 n. 27 (1989). The public cannot rely on the Decree because it is not fair, adequate, nor in the public interest unless a PDR is created and maintained as described.

II. Technical Assistance Grants (TAG) and Green for Grey swaps

It is neither fair nor in the public interest to expect meaningful public participation (United States and State of Ohio v. Northeast Ohio Regional Sewer District
Consent Decree Appendix 4 Requirements Applicable to Proposals for
Green for Gray Substitutions) unless a funding source for proponents similar to the TAG's (Technical Assistance Grants) in the Superfund Program is provided.

There are several indigenous watershed groups in Northeastern Ohio that have earned and enjoy a great deal of public trust, such as Friends of Euclid Creek (1), the Chagrin River Watershed Partners (2), etc., and several land use planning groups recently involved in re-conceptualizing Cuyahoga County Government and/or associated with the Cuyahoga Planning Commission, that may be able to submit credible proposals for green for gray trades with such financial help; the public benefits greatly from their knowledge, credibility and involvement in planning and the strong potential for reduced costs as well as improving other community values. As the sewer district work products emerge from underground into full view of the public via grey-green swaps, aesthetic guidance from architects, landscape architects, artists, and professional critics will be sorely needed to avoid repetition of the Portal Sculpture outside the Cleveland Justice Center Complex(4).

In light of the recent scandals involving the Sewer District and Cuyahoga County Government (3), disinfecting with sunshine can only help in re-earning the public's trust.
There is an understandable tendency for the District to be pre-disposed to selecting Tunnel System solutions to comply with regulatory requirements, and our concern is that District's planning will not pace the ability of other interested parties to generate meaningful alternatives or to monitor projects. For this reason, the District should be required to keep a time line, pert chart, and other planning documents available for public review in the Repository and on their website.

III. Tunnel Integrity Monitoring.
The NEORSD should be required to implement a system of monitors, test wells, and leak detection systems to verify the integrity of the deep underground structures and piping. As we have been reminded by terrible events in recent days (Fairport Harbor Gas explosions, Gulf oil spill) these engineered systems can fail and will age. In the interest of protecting the ground water and the public health, there needs to be in place a system to identify leakage and a plan for repairing each structure or device if needed.

Section 2.3 Post Construction Monitoring and Data Collection should include a sub-section for Leak Monitoring. All deep underground connections of structures and tunnels should have a detection device outside the structure which can detect the presence of escaped affluent. These monitors should signal operators if a leak is detected and the occurrence should be reported to US EPA and O EPA per existing guidelines for such occurrences. The signal should be verified and the leak or other problem corrected in a timely manner as required.

(1) Friends Of Euclid Creek: http://friendsofeuclidcreek.ohlink.net/
(2) Chagrin River Watershed Partners, Inc.: http://www.crwp.org/
(3) Former Sewer District attorney sentenced to nearly six years in prison, Cleveland Plain Dealer, October 19, 2010: http://blog.cleveland.com/metro/2010/10/former_sewer_district_attorney.html

"William Schatz, the former sewer district attorney who pocketed more than $800,000 in bribes and stolen checks, was sentenced Tuesday to nearly six years in prison."

FBI corruption investigation, NEORSD official charged, April 10, 2010: http://cleveland.fbi.gov/dojpressrel/pressrel10/cl042110.htm

...

William B. Schatz was the general counsel of the Northeast Ohio Regional Sewer District (NEORSD) from 1979 until his retirement in August 2007. During his tenure, the NEORSD had major sewage tunnel contracts including the Mill Creek Tunnel Contract, Phases 2 and 3. The information states that from in or about 2000, through on or about April 26, 2007, Schatz corruptly solicited and accepted approximately $682,130.00, from a contractor, identified as Contractor No. 1, who was part of a joint venture working on the Mill Creek Tunnel Contracts. The information alleges that Schatz received the payments through an intermediary company, identified as Client Company No. 1.

...

Plain Dealer article about corruption investigation and charges:
http://blog.cleveland.com/metro/2010/04/the_bill_schatz_factor_how_wil.html

**How will Northeast Ohio Regional Sewer District recover from FBI probe of former lawyer?**

**25, 2010, 12:00 PM Updated Published: Sunday, April: Monday, April 26, 2010, 8:07 AM**

...

So far, sewer district leaders are divided in their reaction to the Schatz charges: Whether they signal an end to a particularly dark era or represent a call to look for more past improprieties.

At the same time, district officials are getting customers ready for double-digit increases in their bills starting in 2012 to pay for the next wave of massive projects mandated by the EPA to stop sewage overflow -- projects similar in size and cost to Mill Creek Tunnel -- the one the FBI says Schatz personally benefited from.

**Sewer corruption cleaned up?**

So sewer district leaders and those 330,000 customers in Cleveland and suburbs have got to be asking themselves today whether the "Schatz factor" on those skyrocketing costs has been truly nailed down.

Later in the article it details the new director's actions to prevent further corruption since 2007.

FBI corruption investigation charges contractor who bribed Shantz:
http://cleveland.fbi.gov/dojpressrel/pressrel10/cl101510.htm

The Information states that from in or about 2000, and continuing until on or about April 26, 2007, Robert J. Kassouf, conspired with William B. Schatz and Stanley Lojek, to unjustly enrich William B. Schatz by paying him over $600,000 during the same time period that the Joint Venture had disputed claims arising from MCT-2 and MCT-3 pending before NEORSD. These payments were made in an effort to influence or reward William B. Schatz in connection with NEORSD legal settlements.

http://blog.cleveland.com/metro/2010/10/former_sewer_district_attorney.html

**Former Sewer District attorney sentenced to nearly six years in prison**

**Published: Tuesday, October 19, 2010, 4:03 PM Updated: Tuesday, October 19, 2010, 5:46 PM**

CLEVELAND, Ohio --

William Schatz, the former sewer district attorney who pocketed more than $800,000 in bribes and stolen checks, was sentenced Tuesday to nearly six years in prison.

Crain's article about Kassouf:
http://www.crainscleveland.com/article/20101015/FREE/101019889

**Contractor Robert Kassouf charged in sewer district corruption investigation**

By JAY MILLER
1:14 pm, October 15, 2010

Westlake contractor Robert Kassouf has been charged by federal prosecutors with one count of conspiracy to commit bribery in the ongoing investigation into corruption at the Northeast Ohio Regional Sewer District

Prosecutors charge that Mr. Kassouf and landfill owner Stanley Lojek conspired to pay more than $600,000 to sewer district attorney William Schatz to influence a legal settlement between the sewer district and a joint venture managed by Mr. Kassouf

Mr. Kassouf's Kassouf Co. was managing partner of a joint venture contracting firm working on the $90 million Mill Creek Tunnel, which will be used to manage sewage overflows during heavy rains.

Mr. Schatz and Mr. Lojek pleaded guilty to related charges in September and await sentencing. Mr. Schatz faces at least five years and 10 months in jail. Mr. Lojek, former president of Harvard Refuse Inc., could serve less than three years in jail.

http://blog.cleveland.com/metro/2010/11/construction_exec_robert_kasso.html

**Construction exec Robert Kassouf pleads guilty in sewer district scandal**

**Published: Friday, November 05, 2010, 3:40 PM Updated: Friday, November 05, 2010, 6:53 PM**

CLEVELAND, Ohio -- A contractor who paid more than $600,000 in bribes to the former lawyer of the Northeast Ohio Regional Sewer District pleaded guilty Friday in federal court.

Robert Kassouf, 61, of Westlake, is the third person convicted in the scandal. The sewer district's former attorney William Schatz and businessman Stanley Lojek also have pleaded guilty in the case.

Kassouf could be sentenced to four to five years in prison when Judge Dan Aaron Polster sentences him Jan. 27. Kassouf must pay between $600,000 and $700,000 in restitution.

..

http://blog.cleveland.com/metro/2010/09/businessman_stanley_lojek_plea.html

**Businessman Stanley Lojek pleads guilty to corruption charge**

**Published: Tuesday, September 14, 2010, 3:57 PM Updated: Tuesday, September 14, 2010, 5:40 PM**

CLEVELAND, Ohio -- Local businessman Stanley Lojek, 83, pleaded guilty Tuesday to conspiracy to commit bribery in the scandal involving former Northeast Ohio Regional Sewer District attorney William Schatz

Lojek admitted that as president of landfill owner Harvard Refuse Inc. he helped a contractor working on the Mill Creek Tunnel project funnel more than $600,000 to Schatz. The money was to encourage Schatz to resolve disputed claims in favor of the contractor and his joint venture

http://blog.cleveland.com/metro/2010/12/stanley_lojek_sentenced_in_sew.html

**Stanley Lojek sentenced in sewer district scandal**

**Published: Friday, December 03, 2010, 8:00 PM Updated: Saturday, December 04, 2010, 2:33 AM**

CLEVELAND, Ohio -- Businessman Stanley Lojek was sentenced to a year and a day in prison Friday for his role in the sewer district bribery conspiracy.

Lojek, 83, of Akron, admitted that as president of Harvard Refuse Inc. he helped a contractor working on the Mill Creek Tunnel project funnel more than $600,000 in bribes to William Schatz, who was the lawyer for the Northeast Ohio Regional Sewer District. 5)

4. http://en.wikipedia.org/wiki/File:Police_Headquarters_and_Portal.jpg

COUNTY OF SUMMIT

**SHERRI BEVAN WALSH**
**Summit County Prosecuting Attorney**
53 University Avenue, 6th Floor
Akron, Ohio 44308-1680

**MARY ANN KOVACH**
Chief Counsel

***CIVIL DIVISION***
(330) 643-2800
(330) 643-8708 Fax

***CRIMINAL DIVISION***
**BRAD GESSNER**
Chief Assistant
**MARGARET SCOTT**
Deputy Chief Assistant
(330) 643-2788
(330) 643-8277 Fax

***VICTIM SERVICES DIVISION***
**KRISTEN ARAPP**
Director
(330) 643-2800
(330) 643-2137 Fax

***COMMUNICATIONS***
**LAURIE CRAMER**
Director
(330) 643-8386
(330) 643-2043 Fax

***CHILD SUPPORT ENFORCEMENT AGENCY***
**JENNIFER BHEAM**
Director
175 South Main Street
P.O. Box 80598
Akron, OH 44308-0598
(330) 643-2765
(330) 643-2745 Fax

***JUVENILE DIVISION***
650 Dan Street
Akron, OH 44310-3989
(330) 643-2943
(330) 379-3647 Fax

***TAX DIVISION***
220 S. Balch Street
Suite 118
Akron, OH 44302
(330) 643-2617
(330) 643-8540 Fax

January 28, 2011

***Via E-Mail to pubcomment-ees.enrd@usdoj.gov and Regular U.S. Mail***

Ms. Ignacia S. Moreno
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044-7611

**Re: United States v. Northeast Ohio Regional Sewer District, D.J. Ref. 90-5-1-1-08177/1**
**Comment by the County of Summit, Ohio to the proposed Consent Decree**

Dear Ms. Moreno:

This correspondence shall serve as the County of Summit, Ohio's Comment to the proposed Consent Decree, recently lodged with the United States District Court for the Northern District of Ohio, Civil Action No. 10-cv-02895.

## I. Introduction

The County of Summit operates the Summit County Metropolitan Sewer District, and serves approximately 45,000 sanitary sewer customers located in various communities throughout Summit County. Sanitary sewerage from certain northern portions of the County's service area is transported through the Northeast Ohio Regional Sewer District's ("NEORSD") Cuyahoga Valley Interceptor, a sanitary sewer trunk line, for treatment at NEORSD's Southerly Treatment Plant. The County pays NEORSD a bulk rate for transport and treatment of this sanitary sewerage based upon flow on a master meter basis at 80 percent of NEORSD's Subdistrict II rate. See the Agreements between NEOSRD and the County, attached as Exhibits A and B for reference.

The County's sanitary sewer system is exclusively a separate sanitary sewer system. There are no combined sewers in the County's system, and the County discharges no combined sewer flow to NEOSRD's system. By design, the County does not contribute storm sewer water to the NEORSD sewer system.

## II. Dramatic Rate Increases for Bulk Rate Users Like the County of Summit

County staff met with the NEORSD management several years ago to discuss effect of NEORSD's contemplated Combined Sewer Overflow Control Measures ("CSO Controls") and whether NEORSD would be passing on charges to the County's master metered bulk area. County staff requested that if a charge was to be incurred for the LTCP that this charge be separately computed and presented so the County could decide course of action with respect to the charges. In order to pay for the capital improvements required under the LTCP, NEORSD has predicted dramatic increases in its sanitary sewer rates that will directly impact the master meter rates paid by the County to NEORSD for treatment of sanitary sewerage in its northern territories. The NEORSD Board of Trustees has already passed a 9 percent increase on its Subdistrict II rates. NEORSD has predicted subsequent increases of 13 percent a year for 5 years, then 10 percent for 2 years, 8 percent for 4 years then yearly increases of 3.7 percent per year through the year 2036 for its Subdistrict II rates. See generally Exhibit C

## III. Predicted Rate Increases Will be Beyond a "High Burden" for County Customers

According to the proposed Consent Order, paragraph 16, NEORSD estimates that the costs of implementing the CSO Controls will be $2,996,000,000, with an additional $2,251,000,000 in non-CSO related capital costs. These expenditures constitute a "high burden" on NEORSD rate payers, as defined in the *U.S. EPA's Combined Sewer Overflows – Guidance for Financial Capability Assessment and Schedule Development*, dated February 1997 ("*Guidance*"). See proposed Consent Order, paragraph 16. This is a reference to the Residential Indicator in the *Guidance*, which is used to assess a permittee's financial capability, and specifically the impact of wastewater and CSO cost controls on individual households. See *Guidance*, p. 10. The Residential Indicator is the permittee's average cost per household (CPH) for wastewater treatment (WWT) and CSO controls as a percentage of the local median household income (MHI). A Residential Indicator greater than 2.0 percent of MHI is deemed a "high" financial impact. *Guidance*, p .19.

There is no indication in the proposed Consent Order that any consideration was given to the impact to the households within the County's territory. The Residential Indicator formula prescribed in the Guidance does not neatly fit the County's situation. In this situation, the County is not the permittee, and the CSO controls are not being directly paid by the County, nor does the rate structure of NEORSD apply directly to the County, since it has its own rate structure for its customers. Nevertheless, it is not difficult to approximate the Residential Indicator by taking the County's flat sewer rate, adding on the increases which NEOSRD predicts it will charge the County, and dividing by the MHI of Summit County residents. Exhibit D to this Comment is a spreadsheet showing this approximation of the Residential Indicator for Summit County households subject to the rate increases. In 2012, the Residential Indicator for

the County's customers in the CVI area jumps above 2 percent of the MHI. By 2015 it is over 3 percent. By 2018 it is over 4 percent, which is double what the Guidance deems a "high" financial impact. County residents may be paying over 10 percent of MHI by the year 2036.

The Guidance contains no direct provisions for the satellite sewer systems of the permittee. Such satellite systems may not be directly paying for the CSO controls, but they may be paying for them through rate increases brought by the permittee. The County urges the U.S. EPA to consider the financial capability of satellite sewer systems of NEOSRD, like the County and its residents, in the analysis and determination of workable long-term CSO control schedules. If NEOSRD increases its bulk rates, the residents of these outlying communities will also suffer tremendous economic hardship.

**IV. Distributing CSO Control Costs to Non Combined Sewer Bulk Rate Customers is an Inequitable Allocation of Costs.**

NEORSD has not stated how much of its predicted increases represent CSO Controls and how much is for non-CSO capital improvements. Yet it appears that NEOSRD plans to pay for CSO Controls by increasing its Subdistrict II rates, and by extension by increasing its charges to satellite sewer systems in the surrounding communities, like the County. However, the County does not have combined sewers, and does not contribute storm sewer water to NEOSRD's system.

Very truly yours,

**SHERRI BEVAN WALSH**
Prosecuting Attorney

**MICHAEL D. TODD**
Assistant Prosecuting Attorney

1264 · COPY 1264

COPY

AGREEMENT

BY AND BETWEEN

THE NORTHEAST OHIO REGIONAL SEWER DISTRICT

and

COUNTY OF SUMMIT

This Agreement made this 5th day of July, 1984, by and between the Northeast Ohio Regional Sewer District (hereinafter referred to as the "District"), a regional sewer district organized and existing under Chapter 6119 of the Ohio Revised Code, pursuant to the authority of Resolution No. 250-84, adopted by the Board of Trustees on July 5, 1984, 1984 (a copy of which is attached hereto and made a part hereof as Exhibit "A") and the County of Summit, Ohio (hereinafter referred to as "Summit County"), pursuant to the authority of Resolution No. 84-348, adopted by the County Council on June 4, 1984 (a copy of which is attached hereto and made a part hereof as Exhibit "B").

WITNESSETH:

WHEREAS, Summit County is desirous of discharging certain wastewater into the Cuyahoga Valley Interceptor of the District; and

WHEREAS, Summit County has agreed to incur the cost of constructing a pump station and force main to permit the discharge of certain wastewater to the Cuyahoga Valley Interceptor; and

WHEREAS, the District has determined that the construction of such a pump station and force main is a proper public improvement and in the public interests because it would further abate pollution;

NOW, THEREFORE, in consideration of the mutual promises and covenants herein contained, the parties agree as follows:

EXHIBIT A

I. DESIGN AND CONSTRUCTION OF GREENWOOD PUMP STATION AND FORCE MAIN

A. Summit County, at its expense, shall arrange for the construction of a pump station and force main and necessary appurtenances thereto as is more fully described in Exhibit C, a copy of which is attached hereto and made a part hereof, in accordance with plans and specifications to be reviewed by the District as set forth later in this Agreement. Summit County acknowledges that it has sole responsibility for the preparation of the design, specifications and other documents necessary for the construction of the pump station and force main. The design preparation and all additional engineering services shall be done at the sole expense of Summit County.

B. The construction of the pump station and force main shall be in accordance with the plans and specifications which shall be subject to review by the District's designated representative. No changes may be made in the plans and specifications, or of other components of the design, be they structural or otherwise, without the prior written approval of the designated representative of the District, except that minor and insubstantial changes may be made at the discretion of Summit County when such changes do not affect the design or structural integrity of the pump station and force main.

C. As part of the criteria for the review of the plans and specifications by the District, Summit County shall submit a schedule for completion of the project.

D. Design and construction shall include the installation of a meter to be specified by the District, but installed by the contractor selected by Summit County. This installation shall be in accordance with the plans and specifications approved by the District.

E. During the period of construction, all construction, work, workmanship, materials and installation involved in or incidental to the construction of the pump station and force main shall be subject, at all times, to inspection by the District's designated representative. Summit County shall give or cause to be given to the District advance notice before starting any work, and shall provide and cause its contractors and subcontractors to provide reasonable and necessary workmanship, materials and installations to be in full compliance with the approved plans and specifications. In the event that the District's designated representative determines that work being done is not in compliance with the approved plans and specifications, Summit County shall take all necessary corrective measures to comply with the approved plans and specifications.

F. Summit County shall be responsible for obtaining all permits and approvals necessary for the construction of the pump station and force main under the laws, rules and regulations of the Federal Government, the State of Ohio or any political subdivision thereof, except those set forth in Article II below.

II. EASEMENTS AND PERMITS

A. In the event that it is necessary to acquire easements and/or permits for the use and occupancy of the land necessary for the construction of the pump station and force main as described in Exhibit "C", Summit County shall, at its own expense, have prepared all the legal descriptions and sketches for all such easements and/or permits which must be acquired.

B. Summit County shall also have the responsibility for acquiring all of the necessary easements and/or permits for the use and occupancy of the property. Summit County shall expend all necessary sums for the appraisals, title work and the purchase of any easements and permits. In addition,

Summit County shall be responsible for obtaining approval of the Ohio Environmental Protection Agency and any and all other approvals mandated. Summit County shall also be responsible for the NPDES permit, if required.

III. TITLE

A. Summit County shall have title for all facilities except the actual physical connection to the Cuyahoga Valley Interceptor and the required metering device, with necessary appurtenances. The actual physical connection with the Cuyahoga Valley Interceptor and the meter and necessary appurtenances shall have, at all times, title vested and shall be considered as property of the Northeast Ohio Regional Sewer District.

B. In addition, Summit County shall retain all right and title to any easements acquired for the construction of the pump station and force main, and such title and incumbent responsibility shall remain with Summit County.

IV. OPERATION AND MAINTENANCE OF THE PUMP STATION AND FORCE MAIN

Summit County covenants that it shall maintain the pump station and force main in good repair and in full operating condition at all times. If at any time the District discovers that the pump station and force main have not been maintained in proper repair and are adversely impacting the volume and/or strength of sewage discharged into the District's sewers, the District shall give notice to Summit County of such deficiencies and Summit County shall, as soon as practical thereafter, commence the necessary repairs, or perform the required maintenance. In addition, Summit County assumes the responsibility for all operating costs and maintenance and repair costs for the pump station and force main, excluding any such costs for the metering device, which is owned by the District, with appurtenances, which shall be borne by the District.

V. SEWER CHARGES

Summit County agrees that the sewage flow through the force main shall be metered and billed to Summit County on a master meter basis. Summit County further covenants that the Subdistrict II rate charged by the District shall apply and the amount billed shall be based on eighty percent (80%) of the metered flow. Summit County shall pay for all charges rendered for the previous month within thirty-five (35) days from the date of tender of the invoice. In any event, Summit County shall not withhold payment in the event of any billing or collection dispute or in the event of any other dispute arising from the construction, operation or maintenance of the pump station and force main. In such instance the parties shall settle such differences at law.

VI. PUMP STATION DESIGN

The District shall have access at all times to the meter area within the pump station. The District shall also have the exclusive right to certify the metering methods and controls as to their accuracy and operability; however, the District shall provide reasonable notice to Summit County prior to any testing or calibration of the metering equipment and Summit County shall have the right to be present when such work is performed. In the event that the meter, from time to time, fails and requires maintenance, then the parties shall immediately agree upon a method to prorate the flow for the interim period. In the event of a sustained outage of the meter, the District and Summit County will prorate for the most recent calculable period, and shall pay an estimated amount until such time as the meter may be repaired or replaced. In addition, there will be a certain maximum flow rate established for the pump station.

VII. SERVICE AREA

The area contained on Exhibit "D" shall define the service area to be encompassed by the force main and pump station. There shall be no additional area included, nor shall there be any area excepted out, without the prior approval of the District. The list of existing customers and all new connections shall be provided immediately by Summit County.

VIII. SEWER USE CODE

All users of the force main and appurtenant pump station shall be subject to the District's Sewer Use Code as now drafted and which is hereby incorporated into this agreement by reference, and to subsequent amendments and revisions as may be, from time to time, made, pursuant to the authority of the Board of Trustees of the District provided that said code shall be applied uniformly to all users within the District.

IX. DISPOSAL OF SLUDGE

Commencing on the date of the signing of this Agreement, and continuing up to and including December 31, 1984, the District covenants that it will continue to accept sludge from Summit County Wastewater Treatment Plant No. 15 in a certain quantity to be limited to 44 dry tons/per month at no cost to Summit County. The concentration of such sludge shall be greater than 20 percent solids, or be less than 5 percent solids. This sludge shall be removed to the Southerly Wastewater Treatment Plant owned by the District for disposal at the District's direction. Any findings and orders issued by the Ohio Environmental Protection Agency or other legal authorities shall be and become a part of this Agreement, and Summit County covenants that it will, at all times, comply with such findings and orders. In addition, Summit County agrees that it will abide with all of the rules and regulations

of the District in respect to the disposal of the sludge at the District's Southerly Wastewater Treatment Plant. Effective January 1, 1985, should Summit County desire to transport sludge to the District for disposal, the charges to be rendered to Summit County and the users thereof shall be those same charges as charged to other comparable entities served by the District. All like rates for the disposal of sludges and/or scavenger septic waste shall apply to any material emanating from the Summit County Wastewater Treatment Plant No. 15.

It is mutually agreed by the parties hereto that the provisions of Section 3(B) of the Cooperative Agreement dated May 6, 1976, by and between the District and Summit County insofar as they pertain to sludge disposal from the Summit County Wastewater Treatment Plant No. 15 are hereby modified as provided hereinabove.

X. INSURANCE

Summit County also agrees to maintain adequate insurance, being not less than $1,000,000 comprehensive general liability and $5,000,000 umbrella liability, naming the District as a co-insured during the course of construction of the force main. Further, Summit County agrees to indemnify and hold the District harmless from any liability whatsoever arising from the construction of the pump station and force main or from any operation and maintenance problems with said pump station and force main.

XI. LIENS

Summit County agrees that it shall be liable for the discharge of any lien, encumbrance or charge (levied because of any mechanic's, laborer's or material man's lien or otherwise) which might be or become a lien, encumbrance or charge upon the easement properties or the material to be

installed in connection with the construction of said pump station and force main.

XII. MODIFICATION AND WAIVER

Despite any thing in this Agreement to the contrary, no covenant, promise, term or condition of this Agreement to be performed or complied with by either party, and no breach shall be waived, altered or modified except by a written instrument executed by the party against whom enforcement of such waiver, alteration or modification is sought. Additionally, no waiver of any breach shall affect or alter this Agreement, but each and every covenant, promise, term and condition of this Agreement shall continue in full force and effect with respect to any other existing or subsequent breach.

XIII. NO COLLATERAL AGREEMENTS

This Agreement contains all the promises, agreements, and conditions, inducements and understandings between the District and Summit County, and there are no promises, conditions, understandings, inducements, warranties or representations oral or written, expressed or implied, between them other than as set forth in this Agreement.

XIV. ARTICLE HEADINGS

The article headings inserted in this Agreement are for convenience only, and are not intended to and shall not be construed to limit, enlarge or effect the intent or scope of this Agreement nor the meaning of any provision hereof.

XV. MERGER

In the event any term or provision of this Agreement shall, for any reason, be invalid, illegal or unenforceable in any respect, such invalidity,

illegality or unenforceability shall not affect any other term or provision hereof, and this Agreement shall be interpreted and construed as if such term or provision, to the extent the same have been held to be invalid, illegal or unenforceable, had never been contained herein.

XVI. NOTICES

All notices, invoices, and requests hereunder shall be in writing and personally delivered or sent by registered or certified mail. Notices to the District shall be delivered or addressed to Erwin J. Odeal, 1127 Euclid Ave., Cleve., OH 44115 or to such other person and place as the District may, from time to time, designate in writing, and notices to Summit County shall be delivered or addressed to Department of Environmental Services, 25 N. Main Street, Akron, Ohio 44308, or to such other person and place as Summit County may, from time to time, designate in writing.

IN WITNESS WHEREOF, this Agreement has been duly executed by the District and Summit County as of the date and year first above written.

SIGNED IN THE PRESENCE OF:

Margaret A. Rowe

Margaret A. Rowe

NORTHEAST OHIO REGIONAL SEWER DISTRICT

By: Louis J Bacci

Title: President

And: Erwin J Odeal

Title: Director

SIGNED IN THE PRESENCE OF:

Barbara E. Tavel

Cathleen J. Crites

COUNTY OF SUMMIT

County Executive

Date: June 14, 1984

Director
Environmental Services

APPROVED AS TO FORM:

GENERAL COUNSEL
County of Summit

The legal form and correctness of the within instrument is hereby approved.

General Counsel
Northeast Ohio Regional Sewer District

NORTHEAST OHIO REGIONAL SEWER DISTRICT
RESOLUTION NO. 250-84

Authorizing the District to enter into an Agreement with the County of Summit, Ohio for the construction of a pump station and force main to permit the discharge of certain wastewater into the Cuyahoga Valley Interceptor Sewer.

WHEREAS, the County of Summit, Ohio is desirous of discharging wastewater from the Greenwood Village area into the Cuyahoga Valley Interceptor Sewer; and

WHEREAS, the County of Summit, Ohio has agreed to incur the cost of constructing a pump station and force main to connect the Greenwood Village area to the Cuyahoga Valley Interceptor Sewer; and

WHEREAS, the construction of such a force main and pump station would further abate water pollution in Summit and Cuyahoga Counties;

NOW, THEREFORE, BE IT RESOLVED BY THE BOARD OF TRUSTEES OF THE NORTHEAST OHIO REGIONAL SEWER DISTRICT:

Section 1. That this Board finds that the construction of a force main and pump station to connect the Greenwood Village area to the Cuyahoga Valley Inteceptor Sewer is in the public interest because it would further abate water pollution in Summit and Cuyahoga Counties.

Section 2. That this Board hereby authorizes and directs the Director to enter into an Agreement with the County of Summit, Ohio in the form set forth in Exhibit A attached hereto and made a part hereof.

Section 3. That this Board declares that all formal actions of the Board concerning and relating to the adoption of this resolution and that all deliberations of the Board and any of its committees that resulted in said formal action were conducted in meetings open to the public and in compliance with all legal requirements, including Section 121.22 of the Ohio Revised Code.

On Motion of Mayor Petruska, Seconded by Mr. Amato, the foregoing resolution was unanimously adopted on July 5, 1984.

Anthony C. Amato
Anthony C. Amato, Secretary
Board of Trustees
Northeast Ohio Regional Sewer District

I, ANTHONY C. AMATO, SECRETARY OF THE BOARD OF TRUSTEES OF THE NORTHEAST OHIO REGIONAL SEWER DISTRICT, DO HEREBY CERTIFY THAT THE FOREGOING IS A TRUE, CORRECT AND EXACT COPY OF THE ORIGINAL OF A RESOLUTION DULY ADOPTED BY SAID BOARD ON THE 5th DAY OF JULY 19 84.

Anthony C. Amato
ANTHONY C. AMATO
SECRETARY, BOARD OF TRUSTEES
NORTHEAST OHIO REGIONAL SEWER DISTRICT

EXHIBIT "A"

EXHIBIT B

Executive-3
Auditor
Prosecutor
Environmental Services
File

RESOLUTION NO. 84-348

SPONSOR Mr. Morgan

DATE June 4, 1984

A RESOLUTION AUTHORIZING THE COUNTY EXECUTIVE TO EXECUTE AN AGREEMENT WITH THE NORTHEAST OHIO REGIONAL SEWER DISTRICT TO PROVIDE FOR THE DISCHARGE OF WASTEWATER FROM THE GREENWOOD VILLAGE FORCE MAIN INTO THE CUYAHOGA VALLEY INTERCEPTOR, AND DECLARING AN EMERGENCY.

WHEREAS, the County has determined to construct the Greenwood Village pump station and force main sanitary sewer line in Sagamore Hills Township per Resolution No. 84-214; and,

WHEREAS, it is necessary to enter into an agreement with the Northeast Ohio Regional Sewer District to provide for the discharge of wastewater from the Greenwood Village force main into the District's Cuyahoga Valley Interceptor; now,

THEREFORE, BE IT RESOLVED by the Council of the County of Summit:

SECTION 1

The County Executive is hereby authorized and requested to enter into an agreement with the Northeast Ohio Regional Sewer District to provide for the discharge of wastewater from the Greenwood Village force main into the District's Cuyahoga Valley Interceptor.

SECTION 2

This resolution is declared an emergency measure to implement the compliance schedule contained in the settlement order of Case No. EBR 77925 for the operation of sanitary sewer facilities in the interest of the health, safety and welfare of the citizens of the County of Summit.

SECTION 3

Provided this resolution receives the affirmative vote of five members, it shall take effect immediately upon its adoption and approval by the Executive; otherwise, it shall take effect and be in force at the earliest time provided by law.

INTRODUCED May 21, 1984

ADOPTED June 4, 1984

[signature]
CLERK OF COUNCIL

[signature]
PRESIDENT OF COUNCIL

APPROVED 6-6-84

[signature]
EXECUTIVE

ENACTED EFFECTIVE June 6, 1984

On roll call: Seven affirmative votes: unanimous.

EXHIBIT "C" - Page 1 of 2

Route and Termini map for Northeast Ohio Regional Sewer District - County of Summit Agreement for Greenwood Village Pump Station and Force Main

February, 1984



EXHIBIT "C" - Page 2 of 2

Route and Termini description for Northeast Ohio Regional Sewer District - County of Summit Agreement for Greenwood Village Pump Station and Force Main.

February, 1984

Beginning at a proposed lift station located in Sagamore Hills Township on the West line of the Cleveland Electric Illuminating Company (CEI) easement described in Summit County Deed Records, Volume 4752, Page 518, approximately 2760 feet South of Aurora Road;

Thence North along said CEI easement to Canyon View Road at the Towpath Draw intersection; approximately 850 feet of 12-inch force main;

Thence Northerly along Canyon View Road to Aurora Road (S.R. 82); approximately 2000 feet of 12-inch force main;

Thence West along Aurora Road to Chaffee Road (C.H. 159); approximately 550 feet of 12-inch force main;

Thence North along Chaffee Road to Valley View Road (C.H. 25) approximately 8250 feet of 12-inch force main;

Thence Northwesterly along Valley View Road to a point 220 feet North of Sagamore Road (C.H. 1); approximately 6400 feet of 12-inch force main; said point being the connection point at the Northeast Ohio Regional Sewer District's Cuyahoga Valley Interceptor.

EXHIBIT "D"

SERVICE AREA MAP



1390

COPY

NAGY
JUN 18 1985

AGREEMENT

by and between

NORTHEAST OHIO REGIONAL SEWER DISTRICT

and

COUNTY OF SUMMIT

THIS AGREEMENT made this 18th day of June, 1985, by and between the Northeast Ohio Regional Sewer District (hereinafter referred to as the "District"), a regional sewer district organized and existing under Chapter 6119 of the Ohio Revised Code, pursuant to the authority of Resolution No. 121-85, adopted by the Board of Trustees on March 28, 1985 (a copy of which is attached hereto and made a part hereof as Exhibit "A") and the County of Summit, Ohio (hereinafter referred to as "Summit County"), pursuant to the authority of Resolution No. 85-390, adopted by the County Council on June 17, 1985 (a copy of which is attached hereto and made a part hereof as Exhibit "B").

W I T N E S S E T H:

WHEREAS, Summit County is desirous of discharging certain wastewater into the Cuyahoga Valley Interceptor of the District; and

WHEREAS, the District and Summit County have determined that the Nagy Park wastewater treatment plant should be abandoned;

NOW, THEREFORE, in consideration of the mutual promises and covenants herein contained, the parties agree as follows:

EXHIBIT B

SECTION I PLANT ABANDONMENT AND FLOW DIVERSION

A. The District, at its expense, shall arrange for the diversion of wastewater flow from the Nagy Park wastewater treatment facility.

B. The County, at its expense, shall dismantle the Nagy Park wastewater treatment facility and restore the plant site to a safe condition.

C. The District shall be responsible for obtaining all permits and approvals necessary for the construction of Cuyahoga Valley Interceptor, and any easements necessary to divert the flows from Nagy Park to CVI.

SECTION II TITLE

Summit County shall have title for all facilities except the Cuyahoga Valley Interceptor and the actual physical connection to the Interceptor and any metering devices and appurtenances, if required.

SECTION III OPERATION AND MAINTENANCE

Summit County covenants that it shall maintain all facilities within the Service Area shown on attached Exhibit C. If at any time the District discovers that the facilities are not being maintained in proper repair and are adversely impacting the volume and/or strength of sewage discharged into the District's sewers, the District shall give notice to Summit County of such deficiencies and Summit County shall, as soon as practical thereafter, commence the necessary repairs or perform the required

maintenance. In addition, Summit County assumes the responsibility for all operating maintenance and repair costs for the facilities within the Service Area excluding any such costs for metering devices which may be required. The District shall be responsible for the costs of operating and maintaining metering devices if installed.

SECTION IV <u>SEWER CHARGES</u>

Summit County agrees that where water is supplied to premises in the Service Area by the City of Cleveland, sewer service charges will be billed to Summit County based upon the quarterly quantity of metered water at the District's standard Subdistrict II rate per MCF. Summit County agrees that where water is supplied to premises in the Service Area by means of wells or water tankers, sewer service charges will be billed to Summit County in accordance with the provisions of Section 1.0506 of the District's Sewer Use Code at the District's standard Subdistrict II rate per MCF. Summit County shall pay for all charges rendered for the previous month within thirty-five (35) days from the date of tender of the invoice. In any event, Summit County shall not withhold payment in the event of any billing or collection dispute or in the event of any other dispute arising from the construction, operation, or maintenance of the pump station and force main. In such instance, the parties shall settle such differences at law.

SECTION IV <u>SERVICE AREA</u>

The area contained on Exhibit "C" shall define the Service Area. There shall be no additional area included, nor shall

there be any area excepted out, without the prior approval of the District. The list of existing customers and all new connections shall be provided immediately by Summit County.

SECTION VI SEWER USE CODE

All users of the Cuyahoga Valley Interceptor shall be subject to the District's Sewer Use Code as now drafted and which is hereby incorporated into this agreement by reference, and to subsequent amendments and revisions as may be, from time to time, made, pursuant to the authority of the Board of Trustees of the District provided that said code shall be applied uniformly to all users within the District.

SECTION VII MODIFICATION AND WAIVER

Despite anything in this Agreement to the contrary, no covenant, promise, term, or condition of this Agreement to be performed or complied with by either party, and no breach shall be waived, altered, or modified except by a written instrument executed by the party against whom enforcement of such waiver, alteration, or modification is sought. Additionally, no waiver of any breach shall affect or alter this Agreement, but each and every covenant, promise, term, and condition of this Agreement shall continue in full force and effect with respect to any other existing or subsequent breach.

SECTION VIII NO COLLATERAL AGREEMENTS

This Agreement contains all the promises, agreements, conditions, inducements, and understandings between the District and

Summit County, and there are no promises, conditions, understandings, inducements, warranties, or representations, oral or written, expressed or implied, between them other than as set forth in this Agreement.

SECTION IX <u>ARTICLE HEADINGS</u>

The article headings inserted in this Agreement are for convenience only, and are not intended to and shall not be construed to limit, enlarge, or effect the intent or scope of this Agreement nor the meaning of any provision hereof.

SECTION X <u>MERGER</u>

In the event any term or provision of this Agreement shall, for any reason, be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other term or provision hereof, and this Agreement shall be interpreted and construed as if such term or provision, to the extent the same have been held to be invalid, illegal, or unenforceable, had never been contained herein.

SECTION XI <u>NOTICES</u>

All notices, invoices, and requests hereunder shall be in writing and personally delivered or sent by registered or certified mail. Notices to the District shall be delivered or addressed to Erwin J. Odeal, 1127 Euclid Avenue, Cleveland, Ohio 44115, or to such other person and place as the District may, from time to time, designate in writing, and notice to Summit County-

shall be delivered or addressed to the Department of Environmental Services, 25 N. Main Street, Akron, Ohio 44308, or to such other person and place as Summit County may, from time to time, designate in writing.

IN WITNESS WHEREOF, this Agreement has been duly executed by the District and Summit County as of the date and year first above written.

SIGNED IN THE PRESENCE OF:

Margaret A. Rowe

Margaret A. Rowe

NORTHEAST OHIO REGIONAL SEWER DISTRICT

By: Edward Pawlin

Title: Vice-president

And: [signature]

Title: Director

SIGNED IN THE PRESENCE OF:

Barbara E. [signature]

[signature]

COUNTY OF SUMMIT

[signature]

County Executive

Date: June 28 1985

[signature]

Director
Environmental Services

APPROVED AS TO FORM:

[signature]

General Counsel
County of Summit

The legal form and correctness of the within instrument is hereby approved.

[signature]

General Counsel
Northeast Ohio Regional Sewer District

NORTHEAST OHIO REGIONAL SEWER DISTRICT
RESOLUTION NO. 121-85

---

Authorizing the District to enter into an Agreement with the County of Summit, Ohio to permit the discharge of certain wastewater into the Cuyahoga Valley Interceptor Sewer.

---

WHEREAS; Summit County is desirous of discharging certain wastewater into the Cuyahoga Valley Interceptor Sewer; and

WHEREAS; the District and Summit County have determined that the Nagy Park Wastewater Treatment Plant should be abandoned and wastewater flow from said plant should be diverted into the Cuyahoga Valley Interceptor Sewer; and

WHEREAS; the diversion of wastewater flow from the Nagy Park Wastewater Treatment Plant will further abate water pollution in Summit and Cuyahoga Counties;

NOW, THEREFORE, BE IT RESOLVED BY THE BOARD OF TRUSTEES OF THE NORTHEAST OHIO REGIONAL SEWER DISTRICT:

Section 1. That this Board finds that the diversion of wastewater flow from Nagy Park Wastewater Treatment Plant into the Cuyahoga Valley Interceptor Sewer is in the public interest because it would further abate water pollution in Summit and Cuyahoga Counties.

Section 2. That this Board hereby authorizes and directs the Director to enter into an Agreement with the County of Summit, Ohio, in the form set forth in Exhibit "A" attached hereto and made a part hereof.

Section 3. That this Board declares that all formal actions of the Board concerning and relating to the adoption of this resolution and that all deliberations of the Board and any of its committees that resulted in said formal action were conducted in meetings open to the public and in compliance with all legal requirements, including Section 121.22 of the Ohio Revised Code.

On Motion of Mr. Richard, Seconded by Mr. Rawlins, the foregoing resolution was unanimously adopted on March 28, 1985.

Anthony C. Amato

Anthony C. Amato, Secretary
Board of Trustees
Northeast Ohio Regional Sewer District

I, ANTHONY C. AMATO, SECRETARY OF THE BOARD OF TRUSTEES OF THE NORTHEAST OHIO REGIONAL SEWER DISTRICT, DO HEREBY CERTIFY THAT THE FOREGOING IS A TRUE, CORRECT AND EXACT COPY OF THE ORIGINAL OF A RESOLUTION DULY ADOPTED BY SAID BOARD ON THE 28th DAY OF MARCH 19 85.

Anthony C. Amato

ANTHONY C. AMATO
SECRETARY, BOARD OF TRUSTEES
NORTHEAST OHIO REGIONAL SEWER DISTRICT

EXHIBIT B

Auditor
Prosecutor
Environmental Services
File

RESOLUTION NO. 85-390

SPONSOR Mr. Morgan

DATE June 17, 1985

A RESOLUTION AUTHORIZING THE COUNTY EXECUTIVE TO EXECUTE AN AGREEMENT WITH THE NORTHEAST OHIO REGIONAL SEWER DISTRICT TO PROVIDE FOR THE DISCHARGE OF FLOWS FROM THE NAGY PARK WASTEWATER TREATMENT PLANT INTO THE CUYAHOGA VALLEY INTERCEPTOR, AND DECLARING AN EMERGENCY.

WHEREAS, the County has determined to abandon the Nagy Park wastewater treatment plant and to discharge the flows to the Cuyahoga Valley Interceptor; and,

WHEREAS, it is necessary to enter into an agreement with the Northeast Ohio Regional Sewer District to provide for the discharge of flows into the Cuyahoga Valley Interceptor; now,

THEREFORE, BE IT RESOLVED by the Council of the County of Summit:

SECTION 1

The County Executive is hereby authorized and requested to enter into an agreement with the Northeast Ohio Regional Sewer District to provide for the abandonment of the Nagy Park wastewater treatment plant and the diversion of wastewater flows into the Cuyahoga Valley Interceptor.

SECTION 2

This resolution is declared an emergency measure to provide for the earliest possible service with the Northeast Ohio Regional Sewer District in the interest of the health, safety and welfare of the citizens of the County of Summit.

SECTION 3

Provided this resolution receives the affirmative vote of five members, it shall take effect immediately upon its adoption and approval by the Executive; otherwise, it shall take effect and be in force at the earliest time provided by law.

INTRODUCED June 3, 1985

ADOPTED June 17, 1985

[signature]
CLERK OF COUNCIL

[signature]
PRESIDENT OF COUNCIL

APPROVED 6-18-85

[signature]
EXECUTIVE

ENACTED EFFECTIVE June 18, 1985

On roll call: Six affirmative votes;
one absent-Mr. Swanson.

EXHIBIT "C" ?

338-10

**TO:** Julius Ciaccia
Executive Director

**DATE:** November 12, 2010

**FROM:** Marlene Sundheimer
Director of Law

**RE:** **Authorization to Amend Resolution No. 55-05 and Execute CSO LTCP Consent Decree**

# CSO Consent Decree Briefing Document

## Authorization Request

The District is seeking authorization to amend Resolution No. 55-05 adopted on March 3, 2005, to modify the schedule for implementation of the District's Combined Sewer Overflow (CSO) Long Term Control Plan (LTCP) and authorize the Executive Director to execute the proposed consent decree.

## Summary

Substantial agreement has been reached between the District's negotiating team and the state and federal governments on the substantive terms and conditions of the CSO consent decree. The District must execute the proposed consent decree to allow it to be forwarded to the appropriate officials with the Department of Justice (DOJ), the Ohio Attorney General's Office (OAG), and US and Ohio Environmental Protection Agencies (EPA) for review and approval. The Executive Director believes it is in the best interest of the District and its rate payers to adopt the negotiated $3.0 billion CSO LTCP with a 25-year schedule and to authorize him to execute the proposed consent decree to resolve alleged violations of the Clean Water Act and implement the proposed plan, **Project Clean Lake**. The United States, the State of Ohio, and the District recognize that this consent decree has been negotiated in good faith and will avoid prolonged and complicated litigation among the parties, and that this consent decree is fair, reasonable, and in the public interest.

The District initiated the consent decree negotiation process in January 2004 shortly after its originally proposed LTCP had been submitted to Ohio EPA pursuant to the terms of the

Figure 1- Cost Comparison of Escalated Original CSO LTCP and Negotiated Agreement




EXHIBIT C



NEORSD-000236

6. Timely application and approval of all permits
7. Implement Nine Minimum Controls
8. Construction and implementation of CSO control measures within approved schedules
9. Post-construction Monitoring
10. Reporting requirements
11. Approval and implementation of chemically-enhanced high rate treatment pilot projects
12. Initial green infrastructure component of CSO control measures
13. Revisions of control measures to incorporate green for gray
14. Achievement of Performance Criteria
15. Payment of civil penalties and completion of Supplemental Environmental Projects

### Cost Escalation Impacts of Negotiations

The current negotiation team has been actively pursuing an agreement and resolution in order to avoid additional program escalation costs. As illustrated in Figure 2 below, the delays in arriving at a negotiated agreement have cost the District $588M in program escalation costs on the original $1.6B CSO LTCP and $53M in escalation costs on the Cost Refinements over the last seven years.

Figure 2 -Cost Comparison of Original CSO LTCP and Negotiated LTCP




While the 2010 negotiated agreement includes additional requests made by the Governments, it is significantly lower than the $3.7B proposal made by the Governments in 2009 as depicted in Figure 2. The concessions made during negotiations to achieve a slightly higher level of control in priority areas, along with wet-weather treatment at the plants, added $331M to the overall costs of the program, bringing the total negotiated program value to $3.0 billion in 2009$$.

**Impact on Rate Payers:** Figure 3 below illustrates that the annual rate increases from 2012 to 2016 are currently estimated to average 13% in order to support the Districts capital program and

operations and maintenance, including the negotiated $3.0 billion CSO LTCP program over the next 25 years. The average annual increase is currently projected at 5.7% thereafter for the next 20 years. The District has been able to reduce the average rate increase for 2012-2016 by restructuring its debt and refining its cash flow to actual bid amounts as opposed to planning estimates. A 2012-2016 rate study is anticipated to be completed in December 2010 and detailed discussions with the Board on future rate increases will take place following rate study completion.

***Figure 3 - Negotiated CSO LTCP Projected Impact on Rates (25-years)***




### What if the Board Rejects the Settlement and EPA Sues the District?

Should the Board elect this option, the Board should expect that the EPA and the Ohio EPA will commence litigation in the Federal courts. As with any litigation, the outcome will be uncertain. However, it is reasonable to anticipate that the EPA and Ohio EPA's starting point, or "floor," for any litigation effort would now be the worst-case offer, or "ceiling," that they placed on the table during negotiations and could include the following:

| | |
|---|---|
| Level of Control (system): | Easterly: 0 overflows for all SST & DVT controlled CSOs and ≤2 overflows @ remaining priority CSOs;<br>Southerly: ≤2 overflows @ priority CSOs;<br>Westerly: 0 overflows @ priority CSOs |
| Level of Control (Plants): | Easterly: 0 bypass events; |

Increase_based_on_25yr_chart

EXHIBIT D

**NEORSD Proposed Rate Increases** Customers Affected 9133

Mean annual Income (2008) [1] $49,528.00
$4,127.33

**Based on Current Disposal Costs** 2011 Flat Sewer Rate/Benefit $62.22
2011 Maintenance Fee Assessment (Minimum) $5.08

| year | proposed rate increase [2] | disposal costs | incremental increase | Cumulative Increase | Cumulative Monthly Increase to Customer Rate | Typ 2011 Monthly Flat Rate Bill (assume 3% annual increase) | Percent Increase from 2010 rate based on Usage of 6HCF per mo | Monthly sewer Bill | Percent of Mean Income |
|---|---|---|---|---|---|---|---|---|---|
| 2010 | | $7,500,000 | | | | | | | |
| 2011 | 1.090 | $8,175,000 | $675,000 | 9.00% | $6.16 | $67.30 | 9.15% | $73.46 | 1.78% |
| 2012 | 1.130 | $9,237,750 | $1,062,750 | 23.17% | $15.86 | $69.32 | 22.87% | $85.18 | 2.06% |
| 2013 | 1.130 | $10,438,658 | $1,200,908 | 39.18% | $26.81 | $71.40 | 37.55% | $98.22 | 2.38% |
| 2014 | 1.130 | $11,795,683 | $1,357,025 | 57.28% | $39.20 | $73.54 | 53.30% | $112.74 | 2.73% |
| 2015 | 1.130 | $13,329,122 | $1,533,439 | 77.72% | $53.19 | $75.75 | 70.21% | $128.94 | 3.12% |
| 2016 | 1.130 | $15,061,908 | $1,732,786 | 100.83% | $69.00 | $78.02 | 88.43% | $147.02 | 3.56% |
| 2017 | 1.100 | $16,568,098 | $1,506,191 | 120.91% | $82.74 | $80.36 | 102.96% | $163.10 | 3.95% |
| 2018 | 1.100 | $18,224,908 | $1,656,810 | 143.00% | $97.86 | $82.77 | 118.22% | $180.63 | 4.38% |
| 2019 | 1.080 | $19,682,901 | $1,457,993 | 162.44% | $111.16 | $85.26 | 130.38% | $196.42 | 4.76% |
| 2020 | 1.080 | $21,257,533 | $1,574,632 | 183.43% | $125.53 | $87.82 | 142.95% | $213.35 | 5.17% |
| 2021 | 1.080 | $22,958,136 | $1,700,603 | 206.11% | $141.05 | $90.45 | 155.94% | $231.50 | 5.61% |
| 2022 | 1.080 | $24,794,786 | $1,836,651 | 230.60% | $157.80 | $93.16 | 169.38% | $250.97 | 6.08% |
| 2023 | 1.037 | $25,712,193 | $917,407 | 242.83% | $166.18 | $95.96 | 173.17% | $262.13 | 6.35% |
| 2024 | 1.037 | $26,663,545 | $951,351 | 255.51% | $174.86 | $98.84 | 176.91% | $273.69 | 6.63% |
| 2025 | 1.037 | $27,650,096 | $986,551 | 268.67% | $183.86 | $101.80 | 180.60% | $285.66 | 6.92% |
| 2026 | 1.037 | $28,673,149 | $1,023,054 | 282.31% | $193.19 | $104.86 | 184.25% | $298.05 | 7.22% |
| 2027 | 1.037 | $29,734,056 | $1,060,907 | 296.45% | $202.87 | $108.00 | 187.84% | $310.87 | 7.53% |
| 2028 | 1.037 | $30,834,216 | $1,100,160 | 311.12% | $212.91 | $111.24 | 191.39% | $324.15 | 7.85% |
| 2029 | 1.037 | $31,975,082 | $1,140,866 | 326.33% | $223.32 | $114.58 | 194.90% | $337.90 | 8.19% |
| 2030 | 1.037 | $33,158,160 | $1,183,078 | 342.11% | $234.12 | $118.02 | 198.38% | $352.13 | 8.53% |
| 2031 | 1.037 | $34,385,012 | $1,226,852 | 358.47% | $245.31 | $121.56 | 201.81% | $366.87 | 8.89% |
| 2032 | 1.037 | $35,657,257 | $1,272,245 | 375.43% | $256.92 | $125.20 | 205.20% | $382.12 | 9.26% |
| 2033 | 1.037 | $36,976,576 | $1,319,319 | 393.02% | $268.96 | $128.96 | 208.56% | $397.92 | 9.64% |
| 2034 | 1.037 | $38,344,709 | $1,368,133 | 411.26% | $281.44 | $132.83 | 211.88% | $414.27 | 10.04% |
| 2035 | 1.037 | $39,763,463 | $1,418,754 | 430.18% | $294.39 | $136.81 | 215.17% | $431.20 | 10.45% |
| 2036 | 1.037 | $41,234,712 | $1,471,248 | 449.80% | $307.81 | $140.92 | 218.43% | $448.73 | 10.87% |
| | total | **$659,786,708** | **$33,734,712** | | | | | | |

[1] Mean Income from US Census Bureau http://quickfacts.census.gov/qfd/states/39/39153.html

[2] Proposed rate increase from CSO Consent Decree briefing document figure 3 "Negotiated CSO LTCP Projected Impact on Rates (25 years)" on Page 8

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
WASHINGTON, D.C. 20460

OFFICE OF
WATER

February 17, 2000

**CWSRF 00-08**

**MEMORANDUM**

SUBJECT: User Charge System Requirements for Treatment Works Constructed under Title II of the Clean Water Act and the Clean Water State Revolving Fund Program

FROM: Michael B. Cook, Director
Office of Wastewater Management

TO: Water Division Directors
Regions I-X

This is in response to recurring questions from various parties concerning the length of time user charge system requirements apply to wastewater treatment works constructed with grant funds awarded under Title II of the Clean Water Act and treatment works constructed with funds made available through the Clean Water State Revolving Fund Program. A discussion of the user charge system requirements under each of the programs is set forth below:

**User Charge Requirements for Treatment Works Constructed With Grant Funds Awarded Under Title II of the Clean Water Act**

Section 204(b)(1)(A) of the Clean Water Act, 33 U.S.C. 1284(b)(1)(A), requires, as a condition of receiving Federal funding for wastewater treatment works, that the applicant:

> . . .has adopted or will adopt a system of charges to assure that each recipient of waste treatment services within the applicant's jurisdiction... will pay its proportionate share...of the costs of operation and maintenance (including replacement) of any waste treatment services provided by the applicant;

Regulations implementing Section 204(b)(1)(A) require that grantees as a condition of Title II funding adopt, implement, and maintain a user charge system. The regulations set forth the requirements for such user charge system(s). Under 40 CFR 35.925-11 (1974) "the applicant must agree that such system(s) will be maintained"...and under 40 CFR Part 35, Subpart E, Appendix B at (f)(1974) "The user charge system...shall be maintained by the grantee in accordance with the following requirements:"

EXHIBIT
E

We have been asked by states, grantees, and rate payers whether the Title II user charge system requirements continue to apply even though the Title II construction grant was awarded many years ago. The answer is yes. The Clean Water Act does not place a time limit on how long the user charge system requirements must be maintained. Early Title II construction grant regulations indicated that user charge system requirements were to be maintained for the service life of the treatment works [40 CFR 35, Subpart E, Appendix B at (d) (1)]. Service life has been interpreted by the Agency as the useful life of the treatment works. Subsequent Title II construction grant regulations stated specifically that user charge system requirements must be implemented for the "useful life of the treatment works" [ 40 CFR 35.2208 (1984)]. "Useful life" is defined as the "period during which a treatment work operates" [40 CFR 35.2005(b)(51) (1984)]. Therefore, so long as the grant-funded treatment works have not been abandoned, or the Federal interests disposed, the Title II construction grant requirements for the user charge system remain as long as the treatment works are operational.

In order for user charge systems to meet the Title II construction grant requirements, each user (or user class) must pay its proportionate share of operation and maintenance (including equipment replacement) costs of the waste treatment services based on the quantity and character of its discharges [40 CFR 35.929-1(a)]. While the statute and regulations permit the establishment of classes of users, the classes that are established must be based on the "users having similar flows and wastewater characteristics; *i.e.*, levels of biochemical oxygen demand, suspended solids, etc." [40 CFR Part 35, Subpart E, Appendix B, at (e)]. Generally, most wastewater treatment grantees establish four user classes having similar wastewater flow and characteristics: residential, commercial, industrial, and governmental/institutional. When such user classes are established, each class is assigned its share of the waste treatment works operation and maintenance (including equipment replacement) costs based on the proportional contribution of the class to the total treatment works loading. Each user within a user class pays its proportionate share of the costs attributed to the user class. When the costs of wastewater treatment increases or decreases, the grantee must proportionately increase or decrease the wastewater treatment rates for each class of users. The one exception to the proportionality requirement is for low income residential users provided in Section 204(b)(1).

**User Charge Requirements for Treatment Works Constructed With Funds Made Available Through the Clean Water State Revolving Fund (CWSRF) Program**

Section 602(b)(6) of the Clean Water Act, 33 U.S.C. 1382(b), requires that treatment works constructed in whole or part before October 1, 1994, with funds made directly available by capitalization grants (known as "CWSRF equivalency funds") from the state water pollution control revolving fund must also comply with the user charge system requirements set forth in Section 204(b)(1)(A) of the Clean Water Act. However, the CWSRF statute and regulations (40 CFR Part 35, Subpart 31) require only that states meet the statutory requirements, not the federal regulatory requirements promulgated for the Title II construction grants program. The CWSRF regulations at 40 CFR 35.3135 allow states to develop their own procedures for implementing the statutory provisions. The statutory requirements for the CWSRF program do not specify a time frame for the imposition of the user charge system. Therefore, states can use the federal regulatory definition for the "useful life" of the facilities, the duration of the loan, or any other criteria to

establish the applicable time period for the user charge system requirements under their CWSRF programs. Each state's CWSRF agency is responsible for establishing its specific user charge system implementation procedures which will be accepted by the Regional Administrator if the procedures adequately assure compliance with the statutory requirements.

In the situations where treatment works received funding from both Title II construction grants and CWSRF loans, the recipients as a minimum must adhere to the user charge system requirements of the Title II construction grants program.

**Compliance Under Title II and CWSRF**

The normal course of action for non-compliance with user charge requirements is for EPA and the state to provide the grantee/loan recipient with technical assistance plus an opportunity to correct its user charge system in order to avoid grant annulment or compliance action.

In the case of Title II grant recipients, the failure to meet the user charge requirements discussed above can ultimately result in the annulment of their construction grant(s) and repayment of all construction grant funds [40 CFR 30.920-5 (1979)]. With regard to CWSRF loan recipients, a state would be expected to bring a compliance action against the loan recipient pursuant to Section 605 of the Clean Water Act and 40 CFR 35.3170 for failure to satisfy the terms of its loan agreement and the state capitalization agreement with regard to user charges system as required by Section 602(b)(6) of the Clean Water Act.

If you have any questions on how user charge requirements apply to these programs, please call me at (202)260-5850 or Haig Farmer at (202)260-7279.

cc: Regional Branch Chiefs
CWSRF Coordinators

**From:** McIlwain, David (ENRD)
**To:** Ellis, Steven (ENRD); Furrie, Kristin (ENRD); Papagiika, Kathryn (ENRD)
**Cc:** Fleetwood, Tonia (ENRD); Waters, Mary (ENRD)
**Subject:** FW: D.J. Reference 90-5-1-1-08177/1
**Date:** Saturday, January 29, 2011 8:30:56 PM

This is your last comment received late last night. We close our books at midnight. And allow three more days for the paper mail catch up.
Dave McI

**From:** Michelle Key
**Sent:** Friday, January 28, 2011 11:00 PM
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** D.J. Reference 90-5-1-1-08177/1

I am writing in concern of the proposed water and sewer rates that will be imposed on our community. Our portion of NE Ohio is under significant financial strain due to the economy here and the proposed hikes in our water and sewer bills due to this judgment will cause financial hardship on almost all of our citizens. Despite a reduction in the unemployment rate in the country, our rate has risen instead of decreasing. There must be some other resource that can be used to assist our area with the cleanup. As you may be aware, Lake Erie has become a much cleaner lake in the past few years. NE Ohio has been doing their best in helping to clean up the lake. I request that you postpone this judgment or find federal money to assist with this judgment as this would cause too much hardship on the citizens of our community.

Thank you,
Michelle Key

Case: 1:10-cv-02895-DCN Doc #: 7 Filed: 02/01/11 1 of 3. PageID #: 142

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**

UNITED STATES OF AMERICA and the STATE OF OHIO

Plaintiffs,

v.

NORTHEAST OHIO REGIONAL SEWER DISTRICT,

Defendant.

Civil Action No. 10-CV-02895

Judge: James Gwin

## MOTION TO WITHOLD CONSENT

Movant requests the Court to withhold consent for the Consent Decree arising from the present case on the following basis.

## BASIS FOR MOTION

1. The National Historic Preservation Act, 16 U.S.C. 470 Section 106, [*16 U.S.C. 470f — Advisory Council on Historic Preservation, comment on Federal undertakings*] states:

> The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking shall, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, as the case may be, take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register. The head of any such Federal agency shall afford the Advisory Council on Historic Preservation

established under Title II of this Act a reasonable opportunity to comment with regard to such undertaking.

2. The Federal agency having jurisdiction over the undertaking proposed in the Consent Decree is the United States Environmental Protection Agency ("EPA").

3. The large geographic area anticipated to be affected by the implementation of the Consent Decree has a high probability of including Historic Properties as defined in 16 U.S.C. 470.

4. The EPA has failed to identify Historic Properties and has failed to conduct a "106 review" as required by The Advisory Council on Historic Preservation's regulations 36 CFR PART 800 -- PROTECTION OF HISTORIC PROPERTIES (incorporating amendments effective August 5, 2004)

**CONCLUSION**

5. Therefore since the obligation of the EPA to abide by Federal law has not been met, the Court must withhold is consent for the Consent Decree until the EPA identifies Historic Properties and conducts a 106 review in advance of this undertaking.

Respectfully submitted

Stephen L. Merkel
Pro Se
380 Oakmoor Rd.
Bay Village, OH 44140
Telephone (440) 835-1720
Fax: (440) 835-9441
merkel51@sbcglobal.net

**CERTIFICATE OF SERVICE**

I certify that on ________________ , 2011, I have mailed the foregoing document by First-Class Mail, postage prepaid, to all case participants, at the following addresses:

STEVEN D. ELLIS
KRISTIN M. FURRIE
Trial Attorneys
Environmental Enforcement Section
Environmental and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 514-3163
Facsimile: (202) 616-6584
steven.ellis@usdoj.gov
kristin.furrie@usdoj.gov

STEVEN M. DETTELBACH
United States Attorney for the Northern District of Ohio
STEVEN J. PAFFILAS
801 West Superior Avenue, Suite 400
Cleveland, OH 44113
Telephone: 216-622-3698
Facsimile: 216-522-4982
steven.paffilas@usdoj.gov

MIKE DEWINE
Ohio Attorney General
SUMMER J. KOLADIN-PLANTZ
Environmental Enforcement Section
30 East Broad Street, 25th Floor
Columbus, Ohio 43215-3400
Telephone (614) 466-2766
Facsimile (614) 644-1926
Summer.Plantz@OhioAttorneyGeneral.gov

Respectfully

Stephen L. Merkel

**January 23, 2011**

**United States Department of Justice**
**P. O. Box 7611**
**Washington, D.C. 20044-7611**

**To Whom It May Concern:**

**Reference: U.S. vs. NEORSD**

**I am definitely against the NEORSD taking the authority to raise our taxes without a vote.**

**I hope you will investigate and make sure it is constitutional and advocate for the citizens of Northeast Ohio.**

**Thank you.**

**Sincerely,**

Anne T. DeVito

**Anne T. DeVito**

Anne T Devito

CLEVELAND OH 440
25 JAN 2011 PM 8 T

USA FIRST-CLASS FOREVER

DOJ MAILROOM
JAN 3 1 2011

U.S. DEPT. OF JUSTICE
P.O. BOX 7611
WASHINGTON D.C. 20044-7611

REFERENCE: U.S. vs. NEORSD

20044+7611

and I appeal to as a last resort to try and save my city & community. I'm sure you are aware of the giant corruption scandal that has made national news here in Cuyahoga County. Recently, the Northeast Ohio Regional Sewer District has signed on to a plan with the EPA (Federal & Ohio) to implement a sewer project that will raise rates on water & sewer by 300% in the next 10 to 15 yrs. I don't think you need reminding that Cleveland is in a depression along with northeast Ohio for about ten years. This could be the death knell to our community as buisinesses will leave in droves in order to avoid this punishing tax.

The water/sewer district has been headed by appointment from the exact corrupt politicians that are either in jail or are about to go to jail. Hundreds of millions of dollars are unaccounted & missing. The city of Phoenix has lower costs for water/sewer than Cleveland & they live in the desert! Cleveland sits on the largest bodies of fresh water in the world! Something is extremely wrong with this picture. The public knows that we are being ripped off and are nearly powerless to stop these corrupt individuals. All contracts that have been enacted run 50% to 75% over budget with no accountability. Back in the 1970's when I was growing up, water bills totaled about $10.00 for 3 months. The same

[illegible] bills have waited in excess of one year to get any responses. The current head of the Water Department, Mr. Darnell Brown was also the head of the Sewer Department for approximately 15 years prior to being switched to the Water Department. If there was ever a stench of corruption, this most definately is it. Please investigate the Northeast Ohio Regional Sewer District. under reference US vs NEORSD. This case should be a ~~cat~~ cakewalk for anyone to find out these abuses and a chance to expose the vast corruption that exists in this area.

– Here is an example of the departments programs! Back in the 1980'S the water/sewer department led a campaign to "Conserve" water after hiking rates 10%-12% per year for 5 years. When the public complied & reduced their water usage, the water/sewer district said it must further raise rates to make up for the lesser use of water. Convoluded? You bet!

I personally ask you ~~to~~ expose & stop these unnecessary new "mamblatas" on the people of Northeast Ohio This corruption needs to end now!

Thank You

Bo Hvidaly

CLEVELAND OH 440

25 JAN 2011 PM 8 T




JAN 31 2011

DOJ MAILROOM

U.S. Dept of Justice
P.O. Box 7611
WASHINGTON DC 20044-7611

20044+7611

To whom will listen

I think in my opinion that the EPA should not mandate to the Northeast Ohio Sewer District at this time. With all the unemployment and foreclosures the people cannot afford the increase's they want to empose. It is not the people's fault with the stormwater its nature's. The lake is the cleanest it has been in the last 30 years. With population decreasing that means less people using sewers.

I barely make it paycheck to paycheck. It seems to me that somebody is after every cent I have. The government is suppose to work for us not against us.

So in my opinion they should fix the sewer system.

The NEORSD has been stealing money from the citizens for years.

Now the Government is going help them get more money for us.

It is a shame to be a American.

over

CLEVELAND OH 440
25 JAN 2011 PM 8 L




US. Department of Justice
WASHINGTON D.C
P.O Box 7611
20044-7611

US. VS. NORTHEAST OHIO

20044+7611

Gibbons

Cleveland, Ohio Jan. 23-2011
44135

Vote NO

on Sewer + Water

Hike.

John + Mary Ellen
Gibbons

USA FIRST-CLASS FOREVER

USA FIRST-CLASS FOREVER

Air Mail

DOJ MAILROOM

FEB - 1 2011

X-RAYED

U.S. Dept - N.E.O.R.SE.
P.O. Box 7611
Washington, DC.
20040-7611

From: Sam Silverman
To: Andrew Cherry/DC/USEPA/US@EPA
Date: 03/20/2011 08:38 PM
Subject: Cleveland, OH

Today's Plain Dealer has maps of three large areas where the demolished homes and boarded up homes equal the number of occupied homes.

Is it possible that a series of artificial lakes can be constructed in these area to serve as the artificial lakes in the Muskingum River valley do, and in some cases reduce the need to remove vast amounts of rock far below the surface? It might very well be a less expensive way to go.

Doing so would enhance the surrounding neighborhoods and perhaps stop the flow of people from the surrounding areas.

In some areas storm water could be diverted to these lakes and seep through the soil and end up clean in Lake Erie

This would be a way of killing two birds with one stone if it will work.

Submitted by Sanford S. Silverman Beachwood, OH

Ellis, Steven

January 18, 2011

D.J.Ref. 5-1-1-08177/1

This is in regard to the proposed sewer rate for Northeast Ohio Residents. I feel that we as a people have been completely ignored in this decision. In a time when gas, utilities,food, etc. are going up,up,up, there is no regard for the welfare and consideration for us except to keep raising rates and prices. ( our money well is running DRY). The residents of Cuyahoga County have had a sales tax increase IMPOSED on them (not Voted) on for a Medical Mart to be built, that will Not benefit 95 percent of the residents. To raise these rates so drastically will only succeed in having our young people move out of the area to settle,have people cancel services)cable, lawn services,and other amenities ) that they cannot afford. I hear a lot of conversation about rain barrel programs to stop water from going into the storm drains, Well, why not eliminate downspouts from houses and let the water drain onto the lawns where it is needed. This water is not going to saturate the Ground anymore than the 15 inches of snow I now have on my lawn when it melts, and come summer my lawn is so dry it's burning up because the ground is so dry. I agree that money is needed to rebuild these sewer systems, but I believe that there is a better way instead of strapping all of us financially. If a sales tax increase could be IMPOSED for a worthless medical mart, surely a sales tax could be raised for a sewer program that is necessary and wouldn't cash strap us all in this time of economic stress.

Thank you for reading
Fred Novotny

[signature]

P.S. I am a 70 year old retiree on a fixed income.

JAN 25 P4 21

Corr.
90-5-1-1-08177/1

Mr. Fred Novota

CLEVELAND OH 440
20 JAN 2011 PM 3 L




Assistant Attorney General
Environmental and Natural Resources Division
P.O. Box 7611
U.S. Dept. of Justice
Washington D.C. 20044-7611

X-RAYED
JAN 25 2011
DOJ MAILROOM

Ref.
United States vs Northeast
Ohio Regional Sewer District
D.J. Ref. 90-5-1-1-08177/1

20044+7611

BEFORE THE UNITED STATES DISTRICT COURT
THE HONORABLE JUDGE DONALD C. NUGENT (formerly Memorandumed to Judge Gwin)
NORTHERN DISTRICT OF OHIO

2011 APR 11 PM
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

Re: **Ref No. DOJ 90-5-1-1-08177/1**
Case Number: 1:10-CV-02895DCN
Amicus Curiae
**Notice of Objection** and Response to
Plaintiff's Response to Motion
For Leave to Appear and File
Additional Information by Nonparty
Eugene Holmes aka
**Amicus Curiae**
**Addendum to the**
**Memorandum in Opposition, instanter**
Filed January 10, 2011 to
The Consent Decree filed December 29,
2010 between the United States of America
And the State of Ohio (Plaintiffs)
versus the Northeast
Ohio Regional Sewer District (Defendant)
Civil Action Number pending the US
District Court, Northern District of Ohio

Now appears Eugene P. Holmes, a United States citizen and resident of the State of Ohio and **affected party** at the original time of filing of the Memorandum, resident of Lorain County, and Penny L. Sisson, requesting permission to appear before the Honorable Court, instanter, also a citizen and resident of the State of Ohio and a cosigner of said attached document to appear before the honorable court to request permission to file a Notice of Objection to Plaintiff's response as it is a misinterpretation of our Amicus Curiae Memorandum originally filed January 10, 2011 and the Addendum filed March 18, 2011, faxed to the Honorable Judge Donald C. Nugent at 11:40 a.m. (216-357-7165) and sent by Certified Mail *7009 2820 0002 9620 2195* on March 21, 2011 to the Clerk of the Honorable Court, Geri M. Smith and received same March 22, 2011.

Again, we state we ask the Honorable Court, emphasis added, to appear jointly before the Honorable Court as a Memorandum and addendum to a Memorandum before the Honorable Court with information and evidence that was given to all parties during the public comment period but was specifically sent as the Ohio State and Federal Rules of Civil Procedure allow an Amicus Curiae Memorandum to be based solely on the information and evidence provided to the Honorable court.

As a courtesy only, Eugene P. Holmes, and now again, Penny L. Sisson, respectfully request permission to appear jointly in not only the Amicus Curiae Memorandum and the Addendum to the Memorandum jointly and again, was ignored by Mr. Steven D. Ellis in his four (4) page Response for Motion to Leave filed.

opinion is [illegible] "public comment" during the public comment period as the Plaintiff Steven [illegible] mistaken in fact of law and reference to Mr. Merkel's filing. To be clear, there is no mention of Mr. Merkel's filing being Amicus Curiae, friend of the court, filing, nor does Steven D. Ellis refer to our filings as Amicus Curiae.

To be explicit and clearer again, no where in the original Amicus Curiae Memorandum and the Addendum to the Original does Eugene P. Holmes and now, Penny L. Sisson, state that this Memorandum and Addendum was solely their intent to file and heard as a public comment only and to do so would violate their civil rights to redress their grievances, due process of law and freedom of speech.

Eugene P. Holmes and Penny L. Sisson now respectfully request this Honorable Court to rule on the Memorandum and Addendum and respectfully request the Honorable Court to rule the Plaintiff's Response is non responsive, misleading and to rule that the Consent Decree is invalid and violates the Constitutional rights of both citizens, Eugene P. Holmes and Penny L. Sisson and that the Consent Decree pending in this case was constructed in violation of state and federal statues, but not limited to only.

We respectfully reserve the right to refile, if necessary, our Memorandum and Addendum to the Memorandum after the public comment period has ended and the Honorable Court would grant us leave to do so, if necessary. **It has always been our intention individually and jointly to have the Honorable Court solely adjudicate our Memorandum and Addendum separately from the public comments period.**

Respectfully submitted and without prejudice,
By: [signature]

By: [signature]
Penny Sisson, Jointly and Individually

Original

BEFORE THE UNITED STATES DISTRICT COURT
THE HONORABLE JUDGE DONALD C. NUGENT (formerly Memorandumed to Judge Gwin)
NORTHERN DISTRICT OF OHIO

2011 MAR 22 PM

Re: **Ref No. DOJ 90-5-1-1-08177/1**
Case Number: 1:10-CV-02895DCN
Amicus Curiae
**Addendum to the**
Memorandum in Opposition, instanter
Filed January 10, 2011 to
The Consent Decree filed December 29, 2010 between the United States of America
And the State of Ohio (Plaintiffs)
versus the Northeast
Ohio Regional Sewer District (Defendant)
Civil Action Number pending the US
District Court, Northern District of Ohio

Now appears Eugene P: Holmes, a United States citizen and resident of the State of Ohio, Lorain County, and Penny L. Sisson, requesting permission to appear before the Honorable Court, instanter, also a citizen and resident of the State of Ohio and a cosigner of said attached document to appear before the court and wishes to present to the Honorable Court additional information (copy hereto, 4 pages of March 7, 2011 document) that was sent to the Honorable Mayor Gary Starr, Middleburg Heights, Ohio on March 7, 2011 by fax only and confirmed by phone as received on same day. Again, we wish to appear Amicus Curiae.

The information attached hereto was given to Mr. Gary Starr as stated to try to demonstrate an apparent pattern of improprieties that was noticed in the Plain Dealer, Cleveland, Ohio that the Northeast Ohio Regional Sewer Board of Directors and their attorneys engage in a pattern that violates Ohio's Open's Meetings Act and, again, is a violation of their constituents and residents of the State of Ohio's state and federal civil rights with full knowledge that the *attorney for the Columbia Township* **Gerald Innes, Assistant Lorain County Prosecutor**, was in possession and was notified May 17, 2005 of same by the American Civil Liberties Union in their May 17, 2005 document, hereto as Exhibit 1 -4. To be clear, these Executive Sessions were held despite the participants had prior knowledge that they were illegal.

To verify, Eugene Holmes is aware that the Chairman/Chief Trustee of Columbia Township, Lorain County, Ohio which is part of the Northeast Ohio Regional Sewer District is Mr. Mike Musto and as such, Mr. Gerald Innes, Esquire, Lorain County Prosecutor's Office, 226 Middle Avenue, Third Floor, Elyria, Ohio 44036 is his legal counsel and was well aware that the Executive Sessions as noted in the Plain Dealer article dated November 17, 2010, Section A, Page 12, that the $700 million dollars in project contingencies that they never intended to use as quoted

by Ciaccia as quoted to Gary Starr, Middleburg Heights, Ohio was discussed in Executive Sessions and under the guise of an implied threat of an eminent law suit and did so even though they were specifically noticed by the American Civil Liberties Union that these Executive Sessions violated the law. These Executive Sessions continued for at least eight (8) years as quoted in the Plain Dealer and to the best of our knowledge and belief, that even the Honorable Mayor Gary Starr was complaining in the Plain Dealer, Cleveland, Ohio that the attorneys and the Executive Director Julius Ciaccia and Darnell Brown, et. Al., was keeping the majority of the not only the majority of the Northeast Ohio Regional Sewer District's members and representatives unaware of the secret negotiations under the same threat of guise of a threat of an imminent law suit, again, to deny the state and federal civil rights of not only the constituents, but even some of NEORSD's own members/representatives of the 62 enjoined districts.

We became aware that the Honorable Mayor Gary Starr filed a lawsuit to protect his integrity and appearances of propriety was under threat of sanctions by the Northeast Ohio Regional Sewer Distrct's Executive Board for disclosing in their opinion information that Mayor Starr was sworn to secrecy during executive sessions that we provided to the Honorable Mayor Gary Starr to show that, in fact, these executive sessions as stated in the Plain Dealer article were illegal, willful and intentional and thus the executive sessions and secrecy could not be invoked and, in fact, violated the civil rights, both federal and state, of every constituent in the 62 affected districts of the Northeastern Ohio Regional Sewer District and in which Mr. Mike Musto again serves as Representative.

At this time, we would respectfully ask this court under the previously filed Memorandum to not only rule that the consent decree violates the civil rights of the constituents involved, but we would ask this Honorable Court to revisit the entirety of the Clean Water Act of 1972 and see if these same issues are present and relevant in the original Clean Water Act of 1972 and that act also violated the federal and state civil rights of the constituents, including but not limited to the federal mandates by the legislatures of the United States of America that are not fully funded from the existing tax dollars already assigned to an overburden and overtaxed constituency.

Additionally, we would like to inform the Honorable Court that in the March 18, 2010 article, Page B5, Julius Ciaccia said before the meeting, "we have already issued bond. We have got a deal with the government. We have got some big projects aside from the government that we have to carry out (Exhibit 5, hereto). We are noticing this Honorable Court that we are not aware that this Honorable Court has formally approved the proposed consent decree, but, already, the Northeast Ohio Regional Sewer District and its' officers, have already issued "bonds." How is this possible? It would appear to the us that this Honorable Court's approval of the proposed "consent decree" pending is not relevant.

**Addendum to the Memorandum**

**Re: Ref No. DOJ 90-5-1-1-08177/1**
Case Number: 1:10-CV-02895DCN

We respectfully request the right to amend, supplement or modify my/our memorandum in opposition as further details become available, especially but not limited to, lack of an administrative process for remedy in citing the constitutional issues of mandates that impose fees without a vote of each and every citizen resident on mandates not fully funded upon the already burdened taxpayer.

Certificate of Service

Pursuant to Rule 5 of the Federal Rules of Civil Procedure, along with the filing of this document with the Honorable Court, I have served the United States Department of Justice, Steven Dettlebach, EPA and the Columbia Township Trustees in care of Mike Musto/NEORSD's Representative and the Honorable Mayor Gary Starr, Middleburg Heights, Ohio and the United States Department of Justice Steven Ellis, EPA on Monday, March 18, 2011 by mail and/or fax.

Respectfully submitted and without prejudice,
By: [signature]
Eugene P. Holmes, Jointly and Individually

By: [signature]
Penny Sisson, Jointly and Individually

Page 3 of 3

Postscript to Steven Dettlebach: In addition to my civil rights charge versus Columbia Township Trustees pending since at least October 26, 2010 please use this additional information in the pending civil rights investigations.

Total Pages: 8

March 7, 2011

The Honorable Mayor Mr. Gary Starr
15700 East Bagley Road
Middleburg Heights, Ohio 44130
Phone: 440-234-8811
Fax: 440-234-9011

Re: Memorandum to clarify and possibly assist in your legal matters pending against the Northeast Ohio Regional Sewer District Board of Directors This information is provided to you for your knowledge.

Dear Honorable Mayor Starr:

We are aware of the pending matters in the United States District Court before the Honorable Judge Donald C. Nugent regarding NEORSD versus the EPA, et. al. We are well aware that they forced you under the threat of sanctions to file to protect your freedom of speech, etc. We came upon a May 17, 2005 ACLU document to the Lorain County Prosecutor's Office, copy hereto, 2 pages, to Assistant Prosecuting Attorney, Gerald A. Innes, Esquire from Jeffrey M. Gamso, Legal Director for the ACLU.

The letter is self explanatory in the matters stating as we understand the situation, the County Commissioners (Lorain) and their use of the executive session was advised proper pursuant to the pending or eminent litigation provision of the Ohio Revised Code, Codified 122.22, Section G, Paragraph 3. The ACLU in their written opinion notified the prosecutor's office of Lorain County that they believe that their interpretation of that provision was incorrect in this situation regarding the take over of the Lorain County Regional Airport on April 28, 2005 and that the Commissioner's Executive Session (closed meeting) during a regularly scheduled meeting violated 122.22, Paragraph B and 305.09 of the Ohio Revised Code.

More specifically, the letter states it appears that the eminent litigation cited by the Commissioners was predicated on the fact that the take over of the airport would eventually require the approval of the Common Pleas Court of Lorain County. Again, it is our opinion such an interpretation is not the type allowable under Ohio's open meetings act. See State Ex Rel Cincinnati Enquirer 2002, OH at Note 3, the court found that such a non adversarial proceeding in the Common Pleas Court did not constitute imminent legal action justifying an executive session.

Eugene Holmes has a memorandum in opposition pending before the Honorable Judge Donald C. Nugent and Steven D. Ellis, the Federal EPA in Washington, DC for which he is a member of the class in this NEORSD action.

We admire your stand to protect your constituency and the integrity that you are demonstrating and hope that this letter from the ACLU can possibly assist you since these same issues are being raised in the possible sanction that NEORSD Board of Directors is considering imposing upon you.

Respectfully,
Eugene Holmes
Eugene Holmes

Penny Sisson

Postscript: It is our opinion based on the reading of the May 17, 2005 ACLU document hereto that the Executive Session that Julius Ciccia mentioned violated the Openings Meetings Act. (copy hereto, 2 pages)


EXHIBIT I

Case: 1:10-cv-02895-DCN Doc #: 12-1 Filed: 03/25/11 2 of 5. PageID #: 172

ACLU
AMERICAN CIVIL LIBERTIES UNION OF OHIO
FOUNDATION

May 17, 2005

Gerald A. Innes, Esq.
Lorain County Prosecutor's Office
Administration Building
226 Middle Ave., 3rd Floor
Elyria, OH 44036

SENT VIA FAX TO 440/328-2183 AND VIA U.S. MAIL

Dear Mr. Innes,

AMERICAN CIVIL LIBERTIES UNION
OF OHIO FOUNDATION
4506 CHESTER AVENUE
CLEVELAND, OH 44103-3621
T/216.472.2220
F/216.472.2210
WWW.ACLUOHIO.ORG
contact@acluohio.org

SHARES

It has come to the attention of the American Civil Liberties Union (ACLU) of Ohio Foundation, Inc. that, on April 28, 2005, during a regularly scheduled meeting of the Lorain County Commissioners, the Commissioners retired to executive session to discuss the takeover of the Lorain County Regional Airport.

As we understand the situation, the County Commissioners were advised that their use of the executive session was proper pursuant to the "pending or imminent litigation" provision of Ohio Revised Code §122.22(G)(3). We believe the interpretation of that provision was incorrect in this situation, and that the commissioners' closed meeting violated §§122.22(B) and 305.09 of the Ohio Revised Code.

More specifically, it appears that the "imminent litigation" cited by Commissioners was predicated on the fact that the takeover of the airport would eventually require the approval of the Common Pleas Court for Lorain County. Again, it is our opinion such an interpretation is not of the type allowable under Ohio's Open Meetings Act.

Indeed, a vague and non-adversarial proceeding does not constitute either "pending" or "imminent" litigation under Ohio law. The Ohio Court of Appeals for the First Appellate District has held that county commissioners may not retreat into executive session "by merely invoking the word 'litigation.'" *See State ex rel. Cincinnati Enquirer v. Hamilton County Comm'rs*, 2002 Ohio 2038, 10 (Ohio Ct. App., 2002). According to the Court of Appeals, "pending" means that court action is actually pending, whereas "imminent" means that a public body has "formally committed itself to a litigative solution and assumed a litigative posture." *See id.* Evidence of imminence can include a public body's decision to commit government resources to prospective litigation (e.g., hiring of special counsel.) *See id.* The Court of Appeals in *Cincinnati Enquirer* explicitly rejected the commissioners' argument that legal action was "imminent" because the

Common Pleas Court had to approve the commissioners' action. *See State ex rel. Cincinnati Enquirer*, 2002 Ohio at Note 3. The court found that such a non-adversarial proceeding in the Common Pleas Court did not constitute imminent legal action justifying an executive session. *See id.*

Because the Lorain County Commissioners' closed meeting on the airport takeover issue clearly did not meet the criteria of "pending" or "imminent" litigation, the ACLU of Ohio Foundation, Inc., strongly recommends the Lorain County Commissioners take all necessary and formal steps to correct this violation of Ohio's Open Meetings Act at its earliest possible convenience.

Failure to rectify this problem will leave me no choice but to recommend the matter for litigation to the ACLU of Ohio Foundation's Board of Directors.

In addition, it should be emphasized that the commissioners must deliberate future issues in open meetings, unless a matter clearly falls within one of the exceptions of §122.22(G). This is required under §§122.22(B) and 305.09 of the Ohio Revised Code.

We respectfully request that you respond to our concerns in a timely manner. Should you have any questions, please do not hesitate to contact me at (216) 472-2220.

Sincerely,

(ex 60)

Jeffrey M. Gamso
Legal Director

cc: Dennis P. Will, Prosecuting Attorney, Lorain County
Elizabeth C. Blair, Lorain County Commissioner
Ted Kalo, Lorain County Commissioner
Lori A. Kokoski, Lorain County Commissioner
Lloyd Snyder, General Counsel, ACLU of Ohio Foundation, Inc.
Christine Link, Executive Director, ACLU of Ohio Foundation, Inc



Exhibit III

March 7, 2011

The Honorable Mayor Mr. Gary Starr
15700 East Bagley Road
Middleburg Heights, Ohio 44130
Phone: 440-234-8811
Fax: 440-234-9011

Re: Memorandum to clarify and possibly assist in your legal matters pending against the Northeast Ohio Regional Sewer District Board of Directors. This information is provided to you for your knowledge.

Dear Honorable Mayor Starr:

We are aware of the pending matters in the United States District Court before the Honorable Judge Donald C. Nugent regarding NEORSD versus the EPA, et. al. We are well aware that they forced you under the threat of sanctions to file to protect your freedom of speech, etc. We came upon a May 17, 2005 ACLU document to the Lorain County Prosecutor's Office, copy hereto, 2 pages, to Assistant Prosecuting Attorney, Gerald A. Innes, Esquire from Jeffrey M. Gamso, Legal Director for the ACLU.

The letter is self explanatory in its written ruling as we understand the situation, the County Commissioners (Lorain) and their use of the executive session was advised proper pursuant to the pending or eminent litigation provision of the Ohio Revised Code, Codified 122.22, Section G, Paragraph 3. The ACLU in their written opinion notified the prosecutor's office of Lorain County that they believe that their interpretation of that provision was incorrect in this situation regarding the take over of the Lorain County Regional Airport on April 28, 2005 and that the Commissioner's Executive Session (closed meeting) during a regularly scheduled meeting violated 122.22, Paragraph B and 335.97 of the Ohio Revised Code.

More specifically, the letter states it appears that the eminent litigation cited by the Commissioners was predicated on the fact that the take over of the airport would eventually require the approval of the Common Pleas Court of Lorain County. Again, it is our opinion such an interpretation is not the type allowable under Ohio's open meetings act. See State Ex Rel Cincinnati Enquirer 2002, Oh at Note 3, the court found that such a non adversarial proceeding in the Common Pleas Court did not constitute [pending] legal action justifying an executive session

Eugene Holmes has a memorandum in opposition pending before the Honorable Judge Donald C. Nugent and Steven D. Ellis, the Federal EPA in Washington, DC for which he is a member of the class in this NEORSD action.

We admire your stand to protect your constituency and the integrity that you are demonstrating and hope that this letter from the ACLU can possibly assist you since these same issues are being raised in the possible sanction that NEORSD Board of Directors is considering imposing upon you

Respectfully,
Eugene Holmes
Eugene Holmes

Penny Simon
Penny Simon

Postscript: It is our opinion based on the reading of the May 17, 2005 ACLU document hereto that the Executive Session that Julian Clocks mentioned violated the Openings Meetings Act. (copy hereto, 2 pages)

First Page of Sent Fax

| Date | Time | Type | Station ID | Duration | Pages | Result |
|---|---|---|---|---|---|---|
| Mar 7 | 12:21PM | Fax Sent | 14402349011 | 1:30 | 3 | OK |

Last Transaction

Personal Printer/Fax/Copier/Scanner
HP Officejet 6310v

Log for
3306482017
3306482017
Mar 07 2011 12:22PM

Gee didn't blink an eye, but he | LAW & ORDER

FRIDAY, MARCH 18, 2011

1

Friday, March 18, 2011 — The Plain Dealer | Breaking news: cleveland.com — Metro | Obituaries

# SEWER

FROM B1

## Proposed sewer rates to rise 76% by 2016

Bucci said the district would like to add a Wastewater Affordability Program that would reduce rates by up to 40 percent for people whose income is at or below 175 percent of the federal poverty level, which is currently about $35,000 for a family of four.

District officials say that over five years the rate increase will bring in an additional $319 million in revenue — money they say they desperately need for payment of debt service obligations on their bonds, for operational expenses and for an estimated $1.2 billion in capital improvements that are scheduled.

Many of those infrastructure improvements result from a $3.3 billion settlement with the U.S. EPA that requires the district to better clean wastewater and stop releasing large amounts of untreated sewage. Those mandated improvements must be made over the next 25 years.

But the sewer district also has a large number of other capital projects, such as building $200 million incinerators which will burn sludge to make energy.

While the EPA settlement is the single-biggest factor in the rate increase, sewer district officials said Thursday that it accounts for slightly more than $3 of every $10 needed from the rate increase.

"We absolutely have to have the money to carry out our obligations," Julius Ciaccia, the district's executive director, said before the meeting. "We've already issued bonds. We've got a deal with the government. We've got some big projects aside from the government that we have to carry out."

Ciaccia, who took the helm of the sewer district in 2007, said that regaining public trust is paramount for the sewer district as it seeks to increase its rates.

Under the old regime, project cost overruns, sometimes costing the district millions of dollars, were common. The sewer district's former attorney, William Schatz, left his post in 2007 just as he became the focus of a federal corruption investigation. He was sentenced last year to nearly six years in prison for taking hundreds of thousands of dollars in bribes from contractors.

"There is big money in the construction projects," Ciaccia said. "And we have significantly changed our practices."

"We now have a three year history of bringing in projects under budget," he added. "We haven't gone back to the board one time for a contract modification."

To reach this Plain Dealer reporter: ddavis@plaind.com, 216-999-4803

## Regional sewer district proposes rate hike

Officials at the Northeast Ohio Regional Sewer District are proposing a five-year rate hike today, which will begin in 2012.

Quarterly bills under the proposed rate hike for 2012 through 2016
For Northeast Ohio Regional Sewer District customers




* Based on water use of 1.875 Mcf (1 Mcf = 7,480 gallons)
** Based on water use of .63 Mcf
*** For elderly and low-income; based on .63 Mcf

SOURCE: Plain Dealer analysis of Northeast Ohio Regional Sewer District data

THE PLAIN DEALER

Death Notice Index
ALLEN Jean A.
BLACK Cynthia K.Cl
BODEN Danny
BROOKER Lola F.
BROWN Douglas
BURNETT Bessie R.
CHAMPEGNY Rich
CIESZYNSKI Mary (Wodek)
CIRINO See Malo
COWGILL Landra
CRAFT Virginia M
CRYSTAL Franc
CZYRBA See Jan
DLUZYNSKI QU
DONAT Jean M
DOREMUS Tho
FENDER Leop
FILES Jean Ma
FORTNEY Rob
FRINGLEY Ra
FULKROAD F
GIELTY See S
GIVEN Ruth
GOODNIGH
GRAVENO
HARRIS De
HENRY Se
HODGKISS
HOWARD
HUMPHRE
HUNTER
JACKSON
JANUARY
JOHNS E
KAMMER
KEATON
KELLY
KIRSCH
KOGER

NEORSD-000269

Exhibit 17