IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF OHIO,<br><br>Plaintiffs,<br><br>v.<br><br>NORTHEAST OHIO REGIONAL SEWER DISTRICT,<br><br>Defendant. | Civil Action No. 1:10-CV-02895-DCN<br><br>Judge Donald C. Nugent |

**EXHIBIT 3**
**DECLARATION OF MARK J. KLINGENSTEIN**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF OHIO,<br><br>Plaintiffs,<br><br>v.<br><br>NORTHEAST OHIO REGIONAL SEWER DISTRICT,<br><br>Defendant. | Civil Action No. 1:10-CV-02895-DCN<br><br>Judge Donald C. Nugent |

**DECLARATION OF MARK J. KLINGENSTEIN**

I, Mark J. Klingenstein, state and declare as follows:

1. I am a civil and sanitary engineer with more than twenty-five years of experience in the environmental field. Since 1981 I have been employed by Science Applications International Corporation ("SAIC"). I am currently a senior environmental engineer and project manager.

2. I received a Bachelor of Science in Civil Engineering from Drexel University (Philadelphia, PA) in 1979, and a Master of Engineering in Civil Engineering from the Stevens Institute of Technology (Hoboken, NJ) in 1989. I am a licensed Professional Engineer in the states of New Jersey, Indiana, and Arizona. I have been a licensed engineer since 1985 (NJ).

3. As part of SAIC's contracts with DOJ and the Environmental Protection Agency ("EPA") Office of Enforcement and Compliance Assurance ("OECA"), I routinely provide expert technical support to EPA and/or USDOJ in Clean Water Act ("CWA") enforcement cases. For the past fifteen years, the majority of the CWA cases I have supported have focused on collection system issues. These cases have involved combined municipal collection systems, separate municipal collection systems, and systems having both combined and separate sewers. I am also called upon to evaluate the causes and impacts of non-compliance at wastewater treatment plants.

4. Cases on which I have recently or am currently providing consulting services to EPA or DOJ include: Youngstown, Ohio; Toledo, Ohio; Cincinnati, Ohio (Hamilton County's Metropolitan Sewerage District of Greater Cincinnati); Akron, Ohio; New Albany, Indiana; Washington, DC (District of Columbia Water and Sewer Authority, or "DCWASA"); Indianapolis, Indiana; Fort Wayne, Indiana; Hammond, Indiana; Pittsburgh, Pennsylvania (Allegheny County Sanitation District); Scranton, Pennsylvania; Kansas City, Missouri; Evansville, Indiana; and Buffalo, New York. In each of these cases, I have provided expert technical support to the case attorneys and government technical staff.

5. I have been retained by the United States Department of Justice ("DOJ") to evaluate the Northeast Ohio Regional Sewer District's ("NEORSD") Combined Sewer Overflows ("CSOs") and wastewater treatment plants, and to render opinions on both. In addition, I have been asked to render opinions on the impact of NEORSD's CSOs on waters that the CSOs are discharged to.

6. My work for DOJ on this matter began in 2004. As part of my work, I have reviewed the proposed long term control plans ("LTCPs") prepared by NEORSD and submitted to the Ohio Environmental Protection Agency "Ohio EPA") from 1999 through 2002 for NEORSD's Easterly, Westerly, and Southerly Districts.[1] In addition, I have reviewed NEORSD's 2005 CSO Facilities Planning Summary Report, prepared by NEORSD and submitted to Ohio EPA and EPA, and numerous additional, updated, or supplemental documents provided to Ohio EPA and EPA from 2006 to the present dealing with solving NEORSD's CSO problems, treatment plant wet weather treatment and capacity issues, and cost documents. I have inspected a number of NEORSD's facilities, including its Easterly, Westerly, and Southerly treatment plants, the Combined Sewer Overflow Treatment Facility ("CSOTF"), located at the Westerly treatment plant, and a number of NEORSD's CSO outfalls and portions of receiving streams where those outfalls discharge. In addition, as a consultant for the United States I attended numerous negotiation sessions with NEORSD in person in Cleveland or by phone from 2004 to the time the Consent Decree negotiations were completed in 2010. The information provided in this Declaration below is based upon my professional experience, my review of the documents described in this paragraph, discussions with NEORSD personnel, and my personal observations from my visits to NEORSD's wastewater treatment plants and CSO outfall locations.

7. In addition to the work described in the paragraph above, in April 2006, I testified on behalf of Ohio EPA in an administrative hearing in which NEORSD challenged Ohio EPA's proposed denial of a Permit to Install NEORSD had sought for improvements to the CSOTF. In that matter, I was retained (through my employment with SAIC) by the Ohio Attorney General's Office.

[1] NEORSD has named the documents comprising its LTCPs as "Phase II Facilities Plans."

8. NEORSD's operates three wastewater treatment plants: Easterly, Westerly, and Southerly. Wastewater collected in NEORSD's sewer system that does not discharge from its CSOs is sent for treatment at one of its treatment plants. NEORSD's wastewater treatment plants generally treat wastewater conveyed to the plants in four stages of treatment before being discharged into Lake Erie or the Cuyahoga River. These stages are preliminary treatment, primary treatment, secondary treatment, and disinfection. Preliminary treatment involves the removal of debris and coarse grit, using screens and various types of grit removal chambers. Primary treatment removes settleable and suspended solids by directing incoming sewage into settling basins ("primary clarifiers") where solids suspended in the sewage sink to the bottom and the resulting "clarified" waste stream proceeds to secondary treatment.

9. Secondary treatment removes soluble organic pollutants, further reduces solids concentrations, and reduces the numbers of pathogenic organisms such as bacteria and viruses. NEORSD's Easterly and Southerly wastewater treatment plants use a form of secondary treatment known as "activated sludge." Activated sludge systems consist of aeration basins and secondary clarifiers. In the aeration basins, cultivated bacteria, known as activated sludge, remove soluble organics by adsorbing and then metabolizing (eating) the adsorbed pollutants as a food source. Harmful pathogen concentrations are reduced by a biological interaction known as predation. The cultivated bacteria grow in number and volume as a result of metabolizing pollutants in the wastewater. The combination of wastewater and activated sludge flows by gravity to secondary clarifiers where the activated sludge solids (including the metabolized influent suspended solids and pathogenic organisms) settle to the bottom and are removed from the clarifiers. Most of this activated sludge is recycled to the aeration basins to consume more soluble organics; the excess sludge is then "wasted" and disposed of pursuant to applicable regulations. The Westerly wastewater treatment plant uses a form of secondary treatment known as trickling filters. Trickling filters also utilize cultivated bacteria; however, here they are grown on the surface of plastic media and the wastewater is distributed over the upper surface of the media. The wastewater trickles down over the surface of the bacteria-coated media before flowing to secondary clarifiers. Other than the physical differences, the trickling filter bacteria and the secondary clarifiers remove pollutants and pathogens as described for activated sludge above. The fourth treatment component consists of disinfection of the secondary effluent by chlorination. Chlorine is added to the wastewater at the upstream end of the contact tanks which provide time for the chlorine to kill bacteria and inactivate other pathogens. Disinfection is followed by the addition of another chemical to remove chlorine ("dechlorination") from the final effluent so as not to damage marine life.

10. Treated wastewater from the Easterly and Westerly plants discharge into Lake Erie. Treated wastewater from the Southerly plant discharges into the Cuyahoga River. Bypasses from the Easterly plant discharge into Lake Erie and bypasses from the Southerly plant discharge into the Cuyahoga River.

11. The rate at which wastewater flows through wastewater treatment plants like Easterly, Westerly, and Southerly, is generally measured by the metric "millions of gallons per day" or "MGD." Since this metric identifies rate of flow, the actual rate of flow at a treatment plant is expected to increase or decrease during the course of a day. A plant that receives incoming wastewater flow (referred to as "influent") at the rate of 240 MGD for an hour will receive 10 million gallons of flow during that hour.

12. Presently, the Easterly plant has preliminary and primary treatment capacities of 400 MGD each, and full secondary treatment capacity of 250-300 MGD. Southerly has preliminary and primary treatment capacities of 735 MGD, and a secondary treatment capacity of 400 MGD. Westerly has preliminary, primary, and secondary treatment capacities of 100 MGD each.

13. Often, during, and for some period of time after a wet weather event, the instantaneous flow of wastewater to the Easterly or Southerly treatment plants exceeds the plant's secondary capacity. In such cases NEORSD discharges the flow following primary treatment into Lake Erie (Easterly plant) or the Cuyahoga River (Southerly plant), bypassing secondary treatment and disinfection. These intentional diversions of wastewater flow from a portion of the treatment facility are known as "bypasses." Wastewater flow volume that would otherwise exceed the capacity of the Westerly plant are sent to the CSOTF, where the wastewater receives some settling treatment, but no disinfection, and is then discharged directly into Lake Erie. Although the CSOTF is located adjacent to the Westerly wastewater treatment plant, Ohio EPA classifies the outfall at the CSOTF as a CSO outfall. Accordingly, the discharges from the CSOTF are classified by Ohio EPA to be CSOs and not bypasses. During the largest storms, when wastewater flows exceed the primary treatment capacity of the Easterly and Southerly plants and the CSOTF, NEORSD discharges the excess wastewater directly into the receiving waters at CSO discharge points.

14. Combined sewers are wastewater collection sewers that are designed to carry both municipal or sanitary sewage (domestic, industrial, and commercial wastewater) and stormwater runoff from rainfall or snow melt in a single system of pipes to a sewage treatment plant. As is the case with many other older and larger mid-west communities, a significant portion of NEORSD's system – twenty percent of the land area within NEORSD's service area – is serviced by combined sewers. These systems were mostly built in the nineteenth century and early part of the twentieth century. During precipitation events, combined sewers are designed to overflow at various points in the system when the sewer collection system capacity is exceeded, resulting in combined sewer overflows that discharge raw municipal sewage plus stormwater directly to receiving waters. These combined sewer overflows ("CSOs") can be a major source of water pollution and are a particular threat to those who have recreational contact with polluted water (e.g., swimmers, people using boats, canoes, and kayaks, and children playing in small streams).

15. NEORSD owns and operates a sewer system that serves approximately 1,000,000 residents that include the City of Cleveland and fifty-nine suburban communities. NEORSD's sewer system accepts wastewater from the sewers of the individual communities and transports the wastewater to its three treatment plants through large "interceptor" sewer lines. NEORSD's combined sewer system includes 126 CSO discharge points which on average discharge a volume of approximately 4.8 billion gallons of mixed sewage and rainwater per year. NEORSD's CSO Permit authorizes it to discharge during wet weather from these CSO points subject to certain conditions and limitations.

16. CSOs contain raw sewage, and public health scientists have long recognized the danger to human health posed by exposure to human fecal matter (*see* EPA's "Summary of the August 14-15, 2002, Experts Workshop on Public Health Impacts of Sewer Overflows"[2] and EPA's August 26, 2004 "Report to Congress: Impacts and Control of CSOs and SSOs"[3]). When CSOs result in the discharge of raw sewage into surface waters which are used for contact recreation or as drinking water sources, they represent a significant pathway for the possible spread of numerous diseases. Sanitary sewage, and thus CSO discharges, can contain a wide range of human pathogens, including bacteria, viruses and parasites. In recognition of the human health and environmental risks posed by CSOs, EPA has made CSO enforcement a national priority.

17. Pursuant to EPA's 1994 CSO Control Policy, NEORSD completed draft LTCP reports for each of its three districts, Easterly, Southerly, and Westerly, during the years 1999 through 2002 and submitted them to Ohio EPA for review. Under its LTCP, NEORSD proposed to construct a series of deep underground tunnels to store combined sewage during wet weather events. NEORSD would then pump the stored water from the tunnels to the appropriate wastewater treatment plant following the end of the wet weather event. NEORSD proposed to construct a number of additional improvements, including an expansion of the CSOTF. NEORSD estimated that the cost, reduced to present value, for its recommended CSO improvement plan was $1.6 billion over thirty years, using 2002 dollars, or $2.2 billion, using 2009 dollars.

18. In developing its LTCP, NEORSD prepared in-depth cost-benefit analyses. For example, for the Easterly LTCP, NEORSD identified feasible technical and hydraulic alternatives for achieving its CSO requirements. NEORSD grouped potential control technologies into functional categories, such as Source Control, Collection System Optimization, Storage, and Treatment. The technologies were screened to make sure that such technologies, by themselves, or in combination with other technologies, were able to achieve NEORSD's CSO control requirements. CSO alternatives were then evaluated with respect to individual CSO outfalls, regional outfall groupings, and system-wide alternatives. NEORSD developed cost estimates for the alternatives. NEORSD

[2] http://www.epa.gov/npdes/pubs/expert_workshop_summary.pdf
[3] http://cfpub.epa.gov/npdes/cso/cpolicy_report2004.cfm

then evaluated the alternatives, analyzed them, and ranked based on environmental, implementability, operability, and economic criteria. NEORSD then narrowed the alternatives for a final array of selected alternatives for different levels of control and undertook a cost-performance assessment to identify appropriate control levels for the highest ranked CSO control alternatives. As part of this development, NEORSD developed a cost-performance curve required by EPA's CSO Control Policy to determine the most cost-effective control level. NEORSD conducted similar analyses for the Westerly and Southerly LTCPs.

19. Based upon my review of NEORSD's LTCP reports for Mill Creek, the Easterly, Westerly, and Southerly basins, NEORSD's 2005 LTCP Summary Report, and other supplemental data related to the preparation of NEORSD's LTCPs, I am familiar with NEORSD's LTCPs and how the LTCPs were developed. As part of NEORSD's LTCP development efforts, NEORSD compiled extensive data from its monitoring program and created sophisticated hydraulic and water quality modeling of its sewer system and receiving waters. NEORSD developed hydraulic modeling to simulate how during various types of rainfall events, sanitary sewage and stormwater are collected and transported in NEORSD's combined sewer, and under what types of conditions combined sewage is discharged from the combined sewers through CSO outfalls. NEORSD collected extensive data, including flow monitoring, field inspections, and a review of drawings of the system. NEORSD installed hundreds of flow monitors and dozens of rain gauges at various places in the system. NEORSD also collected information from 46 years of rainfall records for the Cleveland Hopkins Airport. From this information, NEORSD developed hydraulic models of each of its collection systems (Easterly, Westerly and Southerly) and utilized both dry and wet weather monitoring data to calibrate the models so that they adequately reflect the performance of NEORSD's actual sewer system. Before utilizing the models to characterize the performance of its collection system, NEORSD also carried out an analysis of the available long term rainfall record to identify a "typical year" to use in characterizing the average performance of its collection system. In some cases, a city will identify an actual year that is actually "typical" enough to use to characterize long term average performance of its system, while in other cases, it may be necessary to assemble storms from more than one year into a synthetic "typical year." NEORSD chose the latter option, combining storm events from 1991 and 1993 into a single synthetic "typical year" having the same statistical characteristics (i.e., rainfall depths and intensities, number of events, etc.) as the long-term rainfall record. NEORSD then ran its model to simulate how the combined system operated during various types of rainfall events during a typical year, and the number and volume of discharges from CSO outfalls. I have concluded that the models were developed, calibrated, and utilized in a manner consistent with the current practice in the industry, and that it is appropriate to rely upon the results of the monitoring and modeling in developing and evaluating NEORSD's LTCP.

20. NEORSD also developed water quality modeling as part of the preparation of its LTCP. NEORSD collected existing records and undertook significant additional

monitoring of waters receiving its CSO discharges; this monitoring included wet and dry weather sampling, and stream cross-section surveys. NEORSD also conducted extensive biological monitoring of fish and other marine life, studies of receiving water sediment, and habitat evaluations. NEORSD used these data to develop and calibrate models of receiving water flow and quality. NEORSD then compared water quality model runs with Ohio's water quality standards for the pertinent receiving waters.

21. Based upon my review of NEORSD's LTCP reports and additional and supplemental information provided to us by NEORSD and Ohio EPA, it is my opinion that NEORSD's data collectively demonstrates that Lake Erie, the Cuyahoga River, and other streams receiving NEORSD's CSO discharges have frequently contained concentrations of the bacteria *E. coli* and/or *Fecal coliform* far in excess of the levels that the Ohio state water quality standards consider to be safe for bathing and primary contact recreation. NEORSD's modeling work also demonstrates that its CSO discharges were a significant contributor of bacteria loads to the receiving streams within the NEORSD service area. NEORSD's modeling data also shows that NEORSD's CSOs discharge an average of about 3,000 to 4,000 times collectively per year, counting overflows from each of NEORSD's 126 CSO outfalls on a given day as a separate discharge. Also, sampling performed by NEORSD pursuant to EPA information requests in 2004 and 2007 help confirm what NEORSD's modeling shows, which is that bacteria concentrations in NEORSD's CSO discharges cause or contribute to the excessive bacteria concentrations in the receiving streams.

22. Pursuant to the Consent Decree, NEORSD will construct a series of tunnels, storage tanks, pumping stations, and other improvements to reduce the number of CSO discharges. Based on the most current information the United States has received from NEORSD, plus NEORSD's hydraulic modeling runs, I estimate that NEORSD currently discharges approximately 4.8 billion gallons of combined sewage in a typical year, resulting in a capture of approximately 80 % of total wet weather flows entering NEORSD's combined system. NEORSD estimates that, due to its construction as required by the Consent Decree, its CSO system will be able to capture and treat approximately 91% of total wet weather flows after 12 years, 97% of total wet weather flows after 20 years, and 98.2% of total wet weather flows when the required construction is completed after 25 years. The total amount of untreated NEORSD CSO discharges will be reduced by nearly 89% to 534 million gallons in a typical year. The estimated cost of all of the improvements required to be built under the Consent Decree, including the improvements at the treatment plants, described in Paragraphs 22-26, below, is $3 billion (in 2009 dollars). Twenty-two of the outfalls subject to the Consent Decree are considered priority outfalls where stricter performance criteria apply as set forth in App. 1. Following construction of the improvements required by the Consent Decree, the 104 non-priority outfalls will, in spite of having slightly less strict performance criteria, constitute less than 10% of the approximately 534 MG remaining untreated CSO discharges.

23. During the negotiations with NEORSD, the United States asked me to prepare a number of cost estimates, based on different scenarios and control levels, for NEORSD's LTCP. In 2009, the United States requested that I provide a cost estimate for a LTCP that would result in no overflows per typical year for any of NEORSD's 126 CSOs. Based upon information and documents provided to me by NEORSD in 2007 and 2008, I concluded that NEORSD's LTCP would cost $4.22 million, based upon 2007 dollars. Applying a standard construction cost escalator to update these costs to 2009 dollars, I conclude that NEORSD's total costs to construct and implement a LTCP that would result in no CSOs during a typical year would be approximately $4.9 billion compared to the approximately $3 billion cost for the work required by the Consent Decree. To completely separate NEORSD's combined sewers into separate storm and sanitary sewers would cost well in excess of $5 billion on top of NEORSD's other anticipated non-CSO wastewater collection and treatment capital costs.

24. The Consent Decree requires NEORSD to add additional secondary treatment capacity to its Easterly and Southerly treatment plants. It also requires NEORSD to construct new high rate treatment facilities using either a chemically enhanced treatment system or a ballasted flocculation treatment system at each of NEORSD's three treatment plants to treat excess wet-weather flows that currently cannot be accommodated by even the plants' primary systems. The table below sets forth NEORSD's estimates of the current capabilities, in volume, of its wastewater treatment plants to provide primary and secondary treatment to incoming wastewater flows and compares those figures to the design capabilities that NEORSD is required to construct under Appendix 1 of the Consent Decree.

25. As described in the table below, NEORSD currently has the capacity to provide primary treatment of up to 400 MGD at Easterly, 735 MGD at Southerly, and 100 at Westerly. The Consent Decree does not require an expansion of primary treatment at any of NEORSD's treatment plants. NEORSD currently has the capacity to provide secondary treatment of up to 250-300 MGD at Easterly, 400 MGD at Southerly, and 100 MGD at Westerly. Under the Consent Decree, NEORSD will expand secondary treatment capacity to 400 MGD at Easterly and 615 at Southerly. Because of space limitations, NEORSD is not able to expand secondary treatment capacity at Westerly.

PLANT EXPANSIONS REQUIRED BY CONSENT DECREE

| Plant | Existing Primary/Secondary (Sustained capacity in MGD) | CD Requirements (Sustained Capacity in MGD) Primary/Secondary | New CE HRT or Ballasted Floc Expansions to Treat Excess Flow (Capacity in MGD) |
|---|---|---|---|
| Easterly | 400/250-300 | 400/400 (bypass outfall eliminated) | 400 MGD |
| Southerly | 735/400 | 735/615 (1 treated bypass in typical year.) | 125 MGD |
| Westerly | 100/100 | 100/100 (no change) | 411 MGD (using current CSOTF) |

26. In addition, the Consent Decree requires NEORSD to construct an additional treatment facility at each of the treatment plants employing a technology that involves adding chemicals to induce effective settling of solids at high rates of flow. The effluent from this treatment will then be disinfected. The Consent Decree refers to this treatment as "Chemically Enhanced High Rate Treatment" or "CE HRT." The reasons for constructing the CE HRT systems are described below in Paragraphs 27-28. The purpose of the new treatment units is to provide cost-effective treatment to wastewater that would otherwise be discharged without treatment at Easterly as a CSO, as a bypass at Southerly following primary treatment but no disinfection, and in the case of the CSOTF at Westerly, as a CSO with minimal treatment and no disinfection. NEORSD is required to pilot test the CE HRT units combined with disinfection at each of the plants to see if this treatment process will result in effluent that reaches near-secondary treatment standards for bacteria and suspended solids.

27. If the pilot testing at any of the treatment plants fails to demonstrate that the CE HRT units meet the required performance criteria specified in Appendix 1 to the Consent Decree, NEORSD will be required to construct units with capacity to treat the same rate of flow, but use a treatment technology known as "ballasted flocculation," followed by disinfection.[4] The City of Toledo, Ohio installed such a facility at its Bay

[4] The CSOTF at the Westerly plant is currently composed of four cells for storage, settling, and/or discharge. Pursuant to the Consent Decree, NEORSD plans to convert the existing four cells into a CE HRT unit and construct an additional two-cell CE HRT unit. The pilot testing at Westerly will take place in the converted four-cell CE HRT unit. However, if the pilot tests fail to demonstrate that the CE HRT treatment technology meets the performance criteria in the four-cell unit, NEORSD will be required to construct and use a ballasted flocculation facility in lieu of the additional two-cell CE HRT unit. NEORSD

View wastewater treatment plant as an experimental technology in accordance with a consent decree entered in 2002 by Judge Carr. In 2007, Toledo conducted a study on the effectiveness of the facility's treatment, also in accordance with the consent decree, and found that the treatment resulted in effluent quality at near-secondary levels. Both the CE HRT and the ballasted flocculation treatment systems are capable of providing treatment to combined sewage at high flow rates at a much reduced cost, using a much smaller amount of space than traditional primary and secondary treatment. NEORSD estimates that the construction cost of the proposed CE HRT systems will be much less than a ballasted flocculation system.

28. At the United States' request, NEORSD prepared and submitted to the United States and State of Ohio "No Feasible Alternatives" reports addressing treatment plant capacities and bypasses at NEORSD's Southerly and Easterly plants. NEORSD also submitted to the United States and State of Ohio an "Alternatives Evaluation" for the CSOTF at Westerly that addressed the CSOTF's capacities, and identified alternatives to reduce and better treat CSO discharges at the CSOTF. The "No Feasible Alternatives" reports for the Southerly and Easterly plants outlined improvements that could feasibly be constructed and operated at the two wastewater treatment plants that could reduce or eliminate plant bypasses. According to the analyses carried out by NEORSD, in a typical year, NEORSD bypasses 11 times for a total volume of 267 MG at the Southerly treatment plant and 43 times for a total volume of 719 MG at the Easterly treatment plant. As shown in the table above, NEORSD is required to eliminate its bypass outfall at Easterly, and the improvements required at the Southerly plant are designed to reduce the bypasses to a single overflow (24 MG in volume) during a typical year, and to provide a much improved level of treatment for any such remaining bypasses.

29. The Consent Decree requirements to construct the additional chemically enhanced high rate treatment systems or ballasted flocculation treatment systems at the plants are designed to reduce the flows, currently discharged as CSOs because such flows cannot currently be treated at all by Easterly or Westerly treatment plants. Currently, in a typical year, NEORSD discharges 540 MG of untreated combined sewage at Outfall 001 located adjacent to the Easterly plant, 27 times in a typical year. Following construction of the CSO and treatment plant improvements, Outfall 001 will be expected to discharge no more than 11 MG in untreated flow during no more than 2 partially treated overflow events in a typical year. Similarly, the CSOTF next to Westerly currently discharges approximately 14 times in a typical year with a total volume of approximately 355 MG, with limited solids removal and no disinfection. Once upgraded to a 411 MGD capacity CE HRT, the CSOTF is projected to discharge only 5.7 MG of untreated wastewater per typical year in three events.

---

would not be required to replace the existing four cells with ballasted flocculation, which would cost NEORSD an additional $121 million over the cost of simply converting the existing four cells into a CE HRT unit, because NEORSD would have to demolish the existing four-cell unit prior to constructing the larger ballasted flocculation facility.

30. NEORSD developed the cost estimates for the CSO control measures required under Appendix 1 of the Consent Decree using cost estimating methods that are consistent with industry practice. NEORSD initially developed cost estimates for various control alternatives as part of its Phase II Facility Planning efforts in the late 1990s and early 2000s. As is typical for facility planning level cost estimates, these estimates were generally developed using cost curves and cost equations for individual control measure components (such as pump stations) that were based on then recent actual project costs. As part of its recent negotiations with the United States and the State of Ohio, NEORSD updated its costs and priced out treatment plant improvements. This updating involved both revision of its cost curves and equations based on more recent industry cost data, as well as the re-costing of the major tunnel projects based on greater technical detail, and detailed costing of the treatment plant improvement alternatives. NEORSD has, as is industry practice, assumed non-construction costs and contingencies to be percentages of the calculated construction costs. NEORSD's cost estimating methodology is consistent with current practice for projects and programs at the facility planning/preliminary engineering design stage.

31. When NEORSD presented the United States and the State of Ohio with its approximately $3 billion cost estimate for the CSO and treatment plant improvements required by the Consent Decree, the estimate included contingencies totaling approximately $700 million. I reviewed NEORSD's cost estimates and the documentation supporting the estimates. It is my opinion that NEORSD supported its cost estimates with suitably detailed information, including breakdowns of the contingency and other non-construction cost factors applied to the improvements. Contingency factors are applied to construction cost estimates as part of the process of converting construction costs into capital costs. It is industry practice to apply a contingency factor based upon the level of detail in the cost estimate and the type of project involved. In this case, a substantial amount of the NEORSD's total estimated construction costs involve the seven tunnels and their related appurtenances. The contingency factors applied to facility planning level estimates tend to be higher, because at the facility planning stage, detailed design has not been carried out. Projects which inherently have higher levels of uncertainty, such as tunnels, also are usually assigned higher contingency factors. In my opinion, the contingency factors applied by NEORSD are consistent with the general practice in the industry.

32. The schedule provided in the Consent Decree for construction and achievement of full operations for the improvements required by the Consent Decree reflects not only consideration of financial factors, but also the large number of tunnel projects and three complex wastewater treatment plant upgrades that together make up NEORSD's CSO LTCP. NEORSD explained to us its belief that a shorter schedule would reduce its ability to effective oversee the large number of projects that will be ongoing at any one time throughout the implementation of the LTCP. In particular, NEORSD demonstrated to us that a shorter schedule, such as twenty years, would require it to manage three tunnel projects at one time. NEORSD expressed to the United States

and the State of Ohio concerns regarding its ability to efficiently manage three such complicated projects simultaneously. NEORSD emphasized the importance of maintaining appropriate contract management controls to help reduce the chance of cost overruns and the possibility of malfeasance by contractors. In light of NEORSD's recent history of poor contract management, such concern by NEORSD is reasonable.

33. I have reviewed beach monitoring and advisory report information published by the Ohio State Health Department for the years 2007 through 2010 for the three major public Lake Erie beaches affected by NEORSD's CSO discharges, Edgewater Beach, Euclid Beach State Park, and Villa Angela State Park. The reports provide information based upon the monitoring of beaches along Lake Erie for bacteria to determine whether the beaches are safe for swimming. The Health Department posts advisory notices whenever the bacteria monitoring indicates that a potential health risk to bathers exist based upon the levels of *E coli* detected in the sampling. During the 2007, 2008, 2009, and 2010 summer seasons at Villa Angela State Park, samples were taken during 404 days, resulting in posted beach advisories on 198 days, or 49% of days in which samples were taken. At Euclid Beach State Park, samples were taken during 401 days, resulting in posted beach advisories on 202 days, or 50% of days in which samples were taken. At Edgewater Beach, samples were taken on 403 days, resulting in posted beach advisories on 106 days, or 26% of days in which samples were taken.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1st day of June 2011, at Fairfield, New Jersey.

MARK J. KLINGENSTEIN